Rick E. FREY, Appellee,

v.

HARLEY DAVIDSON MOTOR COM-
PANY, INC., and Lancaster Har-
ley Davidson Inc., Appellees,

v.

Donald Zimmerman, Appellant.

Rick E. Frey, Appellee,

v.

Harley Davidson Motor Company, Inc.,
Lancaster Harley Davidson Inc.,
Appellees,

v.

Donald Zimmerman, Appellee,

Appeal of Lancaster Harley
Davidson, Inc.

Rick E. Frey, Appellant,

v.

Harley Davidson Motor Company, Inc.,
Lancaster Harley Davidson Inc.,
Appellees,

v.

Donald Zimmerman, Appellee.

Superior Court of Pennsylvania.

Argued March 10, 1998.
Filed May 28, 1999
Reargument Denied Aug. 10, 1999.

2

Charles W. Craven, Philadelphia, for Zimmerman.

Joseph Roda, Lancaster, for Frey.

Daniel H. Shertzer, Lancaster, for Lancaster Harley Davidson, Inc.

Before TAMILIA, ORIE MELVIN and BECK, JJ.

TAMILIA, J.:

¶ 1 This action involves consolidated appeals from the judgment entered on February 6, 1997. Appellee/cross-appellant, Rick E. Frey, was seriously injured in a motorcycle accident, and the jury found his injuries resulted from both the negligence of the other driver and the defective condition of Frey's used Harley–Davidson motorcycle.

¶ 2 While this case encompasses complex legal issues, the facts are straightforward. On June 19, 1987, at approximately 4:30 p.m., Frey and the driver of another vehicle, Donald Zimmerman, were involved in an accident at the intersection of Route 322 and Poplar Road in Honeybrook, Chester County, Pennsylvania. As Zimmerman was stopped at the intersection, Frey came over a rise in the road and continued driving his motorcycle west on Route 322. Zimmerman apparently did not see Frey and proceeded to make a left turn from Poplar Road onto 322 east. Frey was subsequently unable to avoid Zimmerman's car and collided with it, causing severe injuries to himself.

¶ 3 On appeal, appellant, Lancaster Harley Davidson, Inc. (LHD), claims Frey failed to produce sufficient evidence that the motorcycle's defective condition was a cause of his injuries, that Frey assumed the risk of injury because he used the motorcycle after knowing of its defective condition, that social policy does not support the application of strict liability to the seller of a used motorcycle and that Frey failed to produce sufficient evidence the defect was present in the motorcycle at the time it was sold. In addition, LHD claims the trial court erred (1) in admitting testimony concerning LHD's alleged practice of disconnecting jumper wires on the motorcycles it sold, (2) in improperly excluding Frey's allegedly inconsistent admissions in a related federal action, (3) in preventing LHD from showing Frey's own actions were a cause of his injuries, (4) in entering summary judgment in favor of Harley Davidson Motor Co., Inc. (HDMC), and (5) in refusing to grant a new trial when Frey failed to disclose his settlement agreement with Zimmerman.

¶ 4 Appellee/cross-appellant Zimmerman argues the jury's verdict is not logically supported by the evidence and he is, therefore, entitled to judgment n.o.v. or a new trial. He also claims the trial court

erred in granting summary judgment in favor of HDMC and contends his liability is limited to the $25,000 policy limit, which was specified in his agreement with Frey. Finally and in the alternative, Zimmerman maintains the judgment should be amended to reflect his "true financial exposure."

¶ 5 Although Frey does not challenge the jury's findings, he does contend the trial court erred (1) in refusing to hold LHD and Zimmerman jointly and severally liable for delay damages, (2) in reducing delay damages due to delays allegedly caused by Frey and (3) in awarding attorneys' fees and costs due to Frey's failure to disclose his agreement with Zimmerman.

¶ 6 At the time of the aforementioned accident, Frey was driving a 1977 Harley–Davidson FLH motorcycle, which he had purchased from LHD in June 1985. The original versions of this motorcycle had two "on" ignition positions, with the first "on" position activating the motorcycle's ignition and the second "on" position activating the ignition and the headlamp. Beginning in 1975, HDMC added a jumper wire to its motorcycles, causing the headlamp to come on when the ignition switch was turned to either position. Frey claimed his motorcycle was in a defective condition because the jumper wire had been cut or disconnected, causing the motorcycle to be less conspicuous, and hence more dangerous, during daytime operation.

¶ 7 On June 19, 1989, Frey initiated the instant action against LHD[1] and brought suit against HDMC in federal district court. Frey filed a complaint in this matter on February 26, 1991, and later filed an amended and second amended complaint. LHD filed an answer and new matter in which it joined HDMC and Zimmerman as additional defendants. Although LHD's answer and new matter included no counts against Zimmerman, it did include him in the caption, and Zimmerman subsequently filed an answer.[2,3] The case then proceeded forward, and by Order dated January 20, 1992, the trial court directed all discovery be completed within sixty (60) days. LHD then filed a motion to compel Frey to answer deposition questions, a motion to compel physical examination of Zimmerman and a motion for extension of time to complete discovery. The trial court granted both the motion to compel Frey to answer deposition questions and the motion to compel Zimmerman to appear for physical examination, and it thereafter extended the discovery deadline for an additional ninety (90) days.

¶ 8 On May 5, 1992, HDMC filed a motion for discontinuance based on the pro-rata settlement agreement it had reached with Frey.[4] HDMC then later filed a motion for summary judgment based on the same release agreement. On July 22, 1992, the trial court granted HDMC's motion for discontinuance, directing that HDMC remain a party only for

1. Frey filed the instant action against LHD, HDMC, Raymond Texter, the Pennsylvania Department of Transportation and Honeybrook Borough. Frey's complaint, however, did not include any counts against HDMC, and his actions against the Pennsylvania Department of Transportation and Honeybrook were both voluntarily discontinued. By Order entered February 10, 1994, the trial court granted summary judgment in favor of Raymond Texter.

2. Frey had previously filed a separate negligence action against Zimmerman at No. 88–04363 of the trial court's civil docket, and that action was later consolidated with the instant matter (N.T., 10/18/95, at 355–356).

3. In his answer to LHD's complaint, Zimmerman did not plead the statute of limitations as a bar to Frey's claims. However, over a year later, LHD filed a second complaint against Zimmerman, and in his response to that complaint, Zimmerman did plead the statute of limitations.

4. A pro-rata settlement agreement requires a plaintiff to reduce his recovery from other defendants in proportion to the settling defendant's share of common liability.

purposes of apportioning liability. However-er, by Order entered February 10, 1994, the trial court granted HDMC's motion for summary judgment and struck HDMC as a party, finding "no evidence in any of the records or documents that I examined which show any responsibility on them anyway." (Record # 160, 2/10/94, at ¶ 1.)

¶ 9 Prior to trial, the parties filed several motions in limine. In its February 10, 1994 Order, the trial court granted Frey's motion to preclude testimony regarding " 'negligence', or words to that effect," but it allowed LHD's expert to "testify as to the mechanics of the accident." (Record # 160, 2/10/94, at ¶ 3.) The court also denied LHD's motion to preclude testimony concerning its practice of cutting jumper wires. *Id.* at ¶ 4. On October 6, 1995, Frey filed another motion in limine, seeking to preclude reference to his settlement with HDMC. Although the record is unclear, the trial court presumably granted this motion.

¶ 10 From October 16 to 20, 1995, the trial court held a jury trial. The jury found the motorcycle was defective when sold to Frey, the defective condition was a substantial factor in causing the accident and Frey had not assumed the risk. It also determined Zimmerman was negligent and his negligence was a substantial factor in causing the accident. Finally, the jury calculated Frey's total damages to be $750,000, assigned LHD liability for 55% of those damages and held Zimmerman responsible for the remaining 45%.

¶ 11 Following trial, Frey filed a motion for delay damages and later, exceptions to assessment of delay damages. LHD and Zimmerman both filed motions for post-trial relief. Thereafter, the trial court granted LHD leave to file an additional post-trial motion based on a previously undisclosed, non pro-rata release agreement between Frey and Zimmerman.[5] The agreement provided as follows:

This will confirm our agreement under which, in return for Plaintiffs' agreeing not to pursue any judgment against Mr. Zimmerman in excess of his insurance coverage of $25,000, Mr. Zimmerman (as Additional Defendant) will not contend that Plaintiff was at fault in any way in connection with the accident, nor seek a jury charge on comparative fault. (*See* Record # 224, Exhibit "B" to Affidavit to Supplement Record.) On December 31, 1996, the trial court denied Frey's exceptions to assessment of delay damages and awarded delay damages in the amount of one hundred and fifty-seven thousand, six hundred and eighty-five dollars and twenty cents ($157,685.20) against LHD and eighty-seven thousand, six hundred and twenty dollars and fifty-six cents ($87,-620.56) against Zimmerman. The court also denied LHD and Zimmerman's post-trial motions, but it ordered Frey to pay LHD $250 for attorneys' fees and costs. In doing so, the court found Frey had failed to provide complete answers in discovery and had thereby failed to disclose his agreement with Zimmerman. On February 25, 1997, Zimmerman filed a motion to amend judgment, which the trial court also denied. LHD, Zimmerman and Frey all filed notices of appeal.

¶ 12 On appeal, LHD first claims Frey failed to produce sufficient evidence that his motorcycle's "inconspicuity" was a cause of the accident. Zimmerman testified that upon stopping at the intersection, he waited for traffic to pass and then looked left, looked right, looked left again and then proceeded (N.T., 10/18/95, at 277–278). Zimmerman further testified Frey was already coming down the rise or crest of the hill when Zimmerman first saw him (N.T. at 283). By that time, however, Zimmerman's car was in the intersection and a collision was imminent (N.T. at 278, 283.) Given the above testimony and the expert testimony on visibility conspicuity, the jury reasonably could have made the

---

5. A non pro-rata (or pro tanto) release agreement only requires a plaintiff to reduce his

recovery from other defendants by the actual amount paid by the settling defendant.

necessary inferences; Frey, therefore, presented sufficient evidence that the motorcycle's inconspicuity contributed to his accident.

¶ 13 LHD next contends Frey assumed the risk of injury by using the motorcycle after he knew of its defective condition. We agree. While Frey maintains "the question of whether a plaintiff assumed the risk of injury is for the jury, because it involves a factual finding as to the plaintiff's subjective knowledge of the specific defect that caused the injury" (Frey's Reply Brief at 18), such is not the case here, unless the jury ignored uncontroverted evidence concerning what knowledge could reasonably be imputed to Frey under the facts of this case.

> Voluntary assumption of the risk involves a subjective awareness of the risk inherent in an activity and a willingness to accept it. A plaintiff has voluntarily assumed the risk where he fully understands it and voluntarily chooses to encounter it. A plaintiff's knowledge and understanding of the risk may be shown by circumstantial evidence.

*Childers v. Power Line Equip. Rentals, Inc.*, 452 Pa.Super. 94, 681 A.2d 201, 208 (1996), *quoting Robinson v. B.F. Goodrich Tire Co.*, 444 Pa.Super. 640, 664 A.2d 616, 618 (1995). In this case, although the jury explicitly found Frey had not assumed the risk of injury, Frey obviously knew the motorcycle's light was not on at the time of the accident. Despite the fact the evidence indicates Frey did not understand the dangers of driving with the headlights off during the day (N.T., 10/18/95, at 371), this position is untenable where he not only received the training required by PennDot to be licensed to operate a motorcycle but, for over seven years, drove a motorcycle as his primary means of transportation. Frey cannot credibly assert he did not understand the risk of driving during daylight without using the headlight.

¶ 14 While the appellant, LHD, requested the court to charge the jury that Frey had assumed the risk of driving without the headlamp on, the request was refused. The assumption of the risk by Frey should have been charged to the jury as a matter of law. The evidence is unrebutted that appellee Frey, in violation of federal standards for motorcycles, and the statutorily mandated safety training, drove the motorcycle without the headlights on during daylight hours. Motor Vehicle Safety Standard 108, **Lamps, Reflective Devices and Associated Equipment**, 49 C.F.R. § 571.108 § 4.6 (1984); **Motorcycle Safety Law**, 75 Pa.C.S. §§ 7901–7911. Under section 7902, **Definitions**, an approved motorcycle safety course is defined, and § 7903, **Waiver of examination**, provides:

> Applicants who have successfully completed an approved motorcycle safety course shall be deemed to have met the requirements of the motorcycle operators license examination administered by the department [of transportation] and the examination shall be waived.

**Motorcycle safety program**, § 7911, provides: "The department shall establish a motorcycle safety education program throughout this Commonwealth." Thus, whether by examination to obtain a motorcycle license or through the approved motorcycle safety course, Frey must be presumed to have knowledge of the requirement that the headlamp must be operational and on during daylight hours.

¶ 15 In addition, regardless of the alleged condition of the light switch and the bypass upon sale by LHD, the subsequent required state inspection of the motorcycle would have disclosed the defect unless Frey reconnected the bypass prior to inspection. **Inspection of motorcycles**, § 4708, provides: "An annual inspection in accordance with section 4702 (relating to periodic inspection of vehicles) shall be established for motorcycles in accordance with the following schedule...." In at least one of the several inspections Frey's motorcycle was required to have undergone during the two years he owned the vehicle before the accident, the defect

would have been discovered and corrected. In relation to this statutory provision, the Department of Transportation has promulgated vehicle inspection standards as follows:

Vehicle Inspection

Required inspection 175.160(a)(6) requires *rejection* if one of the following applies:

. . .

(v) the lamp or filament indicated at switch position does *not* light when the correct switch indicates the lamp should be on.

67 Pa.Code, § 175.160 (emphasis added). The correct switch position in this case is the first stop on the ignition. If the jumper wire had been cut or disconnected, the light would not go on when the ignition was on and the motor running. It would be operational when turned to the second position and, therefore, subject to Frey's control.

¶ 16 As indicated above, inspection of motor vehicles generally is required annually for motor vehicles, pursuant to 75 Pa.C.S. § 4702, and specifically as to motorcycles pursuant to 75 Pa.C.S. § 4708.

¶ 17 Since federal law preempts state law in regulation of safety equipment for vehicles such as motorcycles, the following applies:

The National Highway Traffic Safety Administration ("NHTSA") is the agency created by Congress to implement the National Traffic Safety Act of 1966, *15 U.S.C. § 1381* et seq., (the "Act"), and is charged with promulgating safety regulations thereunder. 49 C.F.R. Pt. 501. Pursuant to this authority, the NHTSA had issued *Federal Motor Vehicle Safety Standard 108* ("FMVSS 108"), entitled "Lamps, Reflective Devices and Associated Equipment." As of the date of sale of the motorcycle in question, it stated:

§ 4.6 When activated:

(a) turn signal lamps, hazard warning signal lamps, and school bus warning lamps shall [**5] flash; and

(b) *all other lamps shall be steady burning, except that means shall be provided to flash headlamps and side marker lamps for signaling purposes.*

(Emphasis added.) Preemption clearly applies in this case pursuant to the following:

*15 U.S.C. § 1397*(a)(1) No person shall— (a) manufacture for sale, sell, offer for sale or introduce or deliver for introduction in Interstate Commerce, or import into the United States, any motor vehicle or item of motor vehicle equipment manufactured on or after the date any applicable Federal Motor Vehicle Safety Standard takes effect under this subchapter unless it is in conformity with such standard except as provided in (b) of this section[.]

*See Verna by Verna v. U.S. Suzuki Motor Corp.*, 713 F. Supp. 823 (E.D.Pa.1989).

¶ 18 With the pervasive requirements surrounding the operation of a motorcycle and the explicit provisions for inspection, licensing and training, a licensed motorcycle driver cannot be heard to say that he was unaware of the requirement that the headlight be *operational* and activated while driving during daylight. This is not a question for the jury but rather is a matter of law to be applied by the court. It is irrelevant that he didn't "understand" the risk when, by his actions in either severing or disconnecting the jumper wire or driving the vehicle with the line disconnected, however this occurred, he knowingly assumed the risk that his safety would be jeopardized. The jury should not have been permitted to speculate his failure to understand the risk could transfer liability for his own actions to LHD, which had no control over those actions. His admission that he always drove *without* the headlight "on" clearly established that he bypassed all federal and state regulatory licensing and safety training requirements and assumed the risk of increased possibility of being involved in an

accident. The law presumes one to know what he should have known and his understanding or lack as to the risk it entailed is not a jury question but a question of law based on the facts of this case. *Commonwealth v. Arnold,* 215 Pa.Super. 444, 258 A.2d 885 (1969) (a law to require protective headgear and/or eye protection for motorcycle drivers is within the police power of the Commonwealth to promulgate and its validity is not a question of fact for a jury as to its constitutionality but one of law on all the facts for the court). Similarly, appellees subjective view of the risk of driving without a headlight during daylight is not subject to review by the jury but a matter of law on all the facts to be determined by the court. In this case, it is clear, under the law based on the facts of this case, Frey assumed the risk.[6] As this Court said in *Kupetz v. Deere & Co., Inc.,* 435 Pa.Super. 16, 644 A.2d 1213 (1994):

> Next, we must determine whether, based upon the evidence presented by Troyer and Deere, the trial court properly gave the jury an assumption of risk instruction. *As stated earlier, a plaintiff is precluded from recovery in a products liability action if he or she knows of the specific defect eventually causing his injury and voluntarily proceeds to use the product with knowledge of the danger caused by the defect. Preliminary and deliberate conduct done with an awareness of the specific risk inherent in the activity is a proper basis for implying assumption of risk. A plaintiff's knowledge and understanding of the risk may be shown by circumstantial evidence.* In other words, evidence that a party assumed a risk may be inferred from surrounding circumstances; *there need not be actual proof*

> *that the plaintiff knew, understood or appreciated the risk.*

*Id.* (emphasis added; citations omitted).

¶ 19 Subsequently, this Court again visited the application of the assumption of the risk doctrine, although it was in a negligence action when the more appropriate doctrine should have been comparative negligence. In *Struble v. Valley Forge Military Academy,* 445 Pa.Super. 224, 665 A.2d 4 (1995), this Court stated:

> In two cases, our Supreme Court has affirmed a trial court's determination that as a matter of law, the plaintiff voluntarily proceeded in the face of a known risk and absolved the defendant from his duty to protect against the injuries sustained. However, a plaintiff will not be precluded from recovering except where it is *beyond question* that he voluntarily and knowingly proceeded in the face of an obvious and dangerous condition and thereby must be viewed as relieving the defendant of responsibility for his injuries.

> . . .

> In our judgment, the within situation is controlled by *Howell v. Clyde,* [533 Pa. 151, 620 A.2d 1107 (1993)]. *A study of the opinions of the Pennsylvania Supreme Court in that litigation leads to the conclusion that the question of whether a litigant has assumed the risk is a question of law and not a matter for jury determination.* We further conclude that once the trial court decides that assumption of the risk is not the basis for a compulsory nonsuit, the jury is to be charged only on comparative negligence.

6. In *Carrender v. Fitterer,* 503 Pa. 178, 469 A.2d 120 (1983), in determining that the assumption of the risk doctrine was not abrogated by the passage of the Comparative Negligence Statute, 42 Pa.C.S.A. §§ 7101 *et seq.,* the majority stated:

The reasoning of this opinion is consistent with the opinion of Mr. Justice Flaher-

ty in *Rutter* [*v. Northeastern Beaver County School District,* 496 Pa. 590, 437 A.2d 1198 (1981)], which specifically noted that a holding that a risk has been assumed is in many cases tantamount to a determination that, as a matter of law, the defendant owed the plaintiff no duty.

*Id.* at n. 6, 469 A.2d at 125 n. 6.

Our conclusion is buttressed by the Commonwealth Court's recent decision in *Giosa v. School District of Philadelphia*, 157 Pa.Cmwlth. 489, 630 A.2d 511 (1993), wherein it ruled that since the jury was charged on comparative negligence, it properly was not charged on the doctrine of assumption of the risk and that issue was not submitted to the jury.

*Id.* (emphasis added).

¶ 20 A review of the law concerning contributory negligence, comparative negligence and assumption of the risk indicates that while the doctrine of contributory and comparative negligence pertain to the apportionment of liability based on causation, assumption of the risk, particularly in product liability cases, is a question of law to be determined by the court.

■ ¶ 21 Third, LHD argues social policy does not support the application of strict liability to the seller of a used product. In *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966), the Pennsylvania Supreme Court adopted the concept of strict liability for the sale of defective products, as embodied in Section 402A of the Restatement (Second) of Torts. Section 402A provides in relevant part as follows:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Under Section 402A, LHD unquestionably could be held liable if Frey had purchased his motorcycle new. LHD contends that policy considerations militate against imposing liability on the seller of a used product; however, we find that the policy considerations cited by LHD simply do not apply to the facts of this case.

¶ 22 LHD points out that sellers of used products often "have no continuing business relationship with the manufacturer" by which to influence critical decisions regarding the products they sell. (LHD's Brief at 17.) This assertion may be true, but it is nevertheless irrelevant to the facts of this case. LHD is the exclusive dealer for Harley–Davidson motorcycles in Lancaster County, Pennsylvania (N.T., 10/17/95, at 212–213). It carries only Harley–Davidson motorcycles and sells both new and used models (N.T. at 69). As such, we find LHD possessed a continuing business relationship with HDMC, and was capable of influencing HDMC's decisions with respect to safety and marketing.

¶ 23 LHD is not a small, fly-by-night used vehicle dealer from which the public might only expect minimal standards be met. Rather, LHD is among an increasing number of new car or vehicle dealers taking over the used vehicle market for high-end resale. The public expects this "new-used" market to meet manufacturer specifications and do more than merely satisfy basic requirements. Moreover, the imposition of liability upon LHD will not drive up the price of used merchandise by necessitating costly inspections. It will, however, assure that LHD correct those defects for which it is reasonably responsible. In this case, the jury believed the evidence LHD actually had caused the defect in question by cutting a jumper wire, which automatically would have turned on the motorcycle's headlight (N.T. at 224–251).

■ ¶ 24 LHD's fourth claim is that Frey failed to produce sufficient evidence that the motorcycle's defect existed at the time of sale. Frey denied cutting or disconnecting the motorcycle's jumper wire (N.T., 10/18/95, at 329–330), and testified that during his use of the motorcycle, he noticed the headlight came on only when the ignition was turned to the second position, (N.T. at 316–317, 331). Frey also

maintained he only learned the jumper wire had been cut after the accident (N.T. at 328–329). Given this testimony, the jury logically could have concluded the defect existed prior to the motorcycle's purchase by Frey.

¶ 25 LHD's last five claims concern alleged errors by the trial court. LHD first points out the jumper wire on Frey's motorcycle had been *cut* and argues the trial court erred in admitting Raymond Texter's testimony concerning LHD's practice of *disconnecting* jumper wires. After reviewing the record, however, we cannot conclude that the trial court abused its discretion in admitting this testimony as evidence of LHD's regular habit or business practice. *See Liles v. Balmer*, 389 Pa.Super. 451, 567 A.2d 691, 693 (1989), *citing Baldridge v. Matthews*, 378 Pa. 566, 570, 106 A.2d 809, 811 (1954). At trial, Texter was questioned concerning his prior deposition testimony, in which he admitted that "in most instances" LHD would automatically disconnect the jumper wires on the motorcycles it sold (N.T., 10/17/95, at 230–231, 234–236). Although Texter denied LHD ever cut the jumper wires on its motorcycles, he did state that when a motorcycle already was assembled (such as a used motorcycle), it took "considerably longer" to disconnect the jumper wires, which could be cut "in a hurry" (N.T. at 232–233, 242–245). Texter also admitted LHD did not inspect its motorcycles to determine whether a previous owner had cut or disconnected the motorcycle's jumper wires (N.T. at 248–250).

¶ 26 Secondly, LHD contends the trial court improperly excluded Frey's admissions in the related federal action.[7] The admissions were contained in Frey's answers to interrogatories, and after reviewing the record, we agree with the trial court that there was no inconsistency between Frey's testimony at trial and his admissions in the federal action (N.T., 10/18/95, at 344–355). In his federal case,

Frey maintained the motorcycle was defective because its design allowed for the easy disconnection of the jumper wires. In this case, Frey claimed LHD disconnected (or cut) the wires and/or sold a motorcycle that was defective because of the cut wires. Furthermore, even if Frey's admissions were in some manner inconsistent with his trial testimony, their probative value was far outweighed by the potential prejudice to Frey, which would have been caused by any reference to parallel litigation and the recovery of money from other sources.

¶ 27 LHD also argues the trial court erroneously prevented it from showing Frey's own actions were a cause of his injuries. Upon reviewing the record, we find this claim to be without merit. While LHD contends Frey caused the accident by failing to drive around Zimmerman and by failing to use both front and rear brakes, this is not the sort of reckless conduct which would constitute a superseding cause. *Childers v. Power Line Equip. Rentals, supra* ; *Bascelli v. Randy, Inc.*, 339 Pa.Super. 254, 488 A.2d 1110, 1113–1114 (1985) (citing plaintiff's admission he had been driving his motorcycle at a speed of 100 miles per hour). As a result, this case falls within the general rule that contributory and comparative negligence are not defenses to a strict product liability action. *Kimco Dev. Corp. v. Michael D's Carpet Outlets*, 536 Pa. 1, 637 A.2d 603 (1993); *McCown v. International Harvester Co.*, 463 Pa. 13, 342 A.2d 381 (1975). Of course, the general rule does not apply in a case such as this, if it is found the plaintiff assumes the risk knowing of a defect which he later claims is the substantial cause of the accident. *See Ferraro v. Ford Motor Co.*, 423 Pa. 324, 327, 223 A.2d 746, 748 (1966) (If a buyer knows of a defect in a product and *voluntarily* and *unreasonably* proceeds to use the product, this should preclude recovery and

7. Frey apparently did not verify the set of answers to interrogatories, which contained

many of these admissions (N.T., 10/18/95, at 353–354).

constitute a complete defense to the action even in cases of strict liability).[8]

■ ¶ 28 In its fourth claim of trial court error, LHD maintains the trial court erroneously entered summary judgment in favor of HDMC. By Order entered February 10, 1994, the trial court granted summary judgment in favor of HDMC and struck it as a party to this action. (Record # 160, 2/10/94, at ¶ 1.) Under the rules of *appellate procedure effective at that time*, this was a final Order, and the parties, therefore, had thirty (30) days in which to file notice of appeal. Pa.R.A.P. 341, **Final Orders; Generally, Note**.[9] Having failed to do so, the parties cannot now be heard to complain and we find this issue has been waived.

■ ¶ 29 Finally, LHD contends the trial court erroneously refused to grant a new trial after LHD discovered Frey had failed to disclose a settlement agreement with Zimmerman. Under the agreement, Frey agreed not to pursue any claims against Zimmerman and Zimmerman tendered the limits of his insurance coverage and agreed he "[would] not contend that [Frey] was at fault in any way." While LHD contends "[it] was prejudiced by being unable to interrogate Zimmerman as to his possible bias," we find this contention to be without merit. (*See* LHD's Brief at 42.) First, the agreement in ques-

tion cannot be characterized as a "Mary Carter Agreement." *See Hatfield v. Continental Imports, Inc.*, 530 Pa. 551, 610 A.2d 446 (1992). Since Zimmerman was still liable for a claim of contribution, the agreement did not alter Zimmerman's "normal" interest such that he benefited by fostering Frey's case. *Id.* at 558, 610 A.2d at 449. Second, LHD's liability was based on a claim sounding in strict product liability, and LHD was therefore not entitled to benefit from any testimony regarding Frey's alleged fault. *See Kimco Dev. Corp.*, *supra*.

¶ 30 In his cross appeal, Zimmerman first argues he is entitled to judgment n.o.v. or, in the alternative, a new trial because the jury's verdict is not logically supported by the evidence. Specifically, he maintains that either the motorcycle was "visible" and LHD was not liable for any alleged defect, or the motorcycle was not visible and Zimmerman did nothing wrong. While this argument does bear a certain amount of superficial logic, it is nevertheless wholly without merit. Clearly, Frey's motorcycle was "visible"[10] with or without its headlight illuminated; without the headlight on, the motorcycle was simply less discernable and lacked conspicuity. Had Zimmerman been paying closer attention, he might have noticed Frey's motorcycle in time to avoid a collision. By

---

8. Despite the language in *Ferraro v. Ford Motor Co.*, 423 Pa. 324, 223 A.2d 746 (1966), that knowledge of a defect followed by *voluntary* and *unreasonable* use thereafter should preclude recovery even in cases of strict liability, this case is distinguishable in that use of a *motorcycle during daylight hours without an operating headlight may not be per se unreasonable* as would be the case of using a vehicle with a defect causing a wheel lock and a malfunctioning gas pedal on several previous occasions as in *Ferraro*. This does not, however, preclude assumption of the risk. The Restatement (Second) of Torts, § 496A, in pertinent part, provides:

 Comment:
 c. *Meanings of assumption of risk.*
 . . .
 3. In a third type of situation the plaintiff, aware of a risk created by the negli-

gence of the defendant, proceeds or continues voluntarily to encounter it.... The same policy of the common law which denies recovery to one who expressly consents to accept a risk will, however, prevent his recovery in such a case.

9. Currently, an Order is not final unless it disposes of all claims and of all parties. However, the amendments imposing this requirement apply only to actions commenced after July 6, 1992, or Orders entered on or after March 1, 1994. Since this action/Order does not fit into either of those categories, the trial court's Order of February 10, 1994, was final and immediately appealable.

10. By use of the term "visible", we mean the motorcycle did not disappear when its headlight was not in operation.

its findings, the jury necessarily determined Zimmerman was not paying adequate attention, and his actions therefore contributed to the accident. By the same token, LHD could not be relieved of liability, but for Frey's assumption of the risk, because if LHD had sold a motorcycle with an automatically activated headlight, Zimmerman, despite not paying close attention to oncoming traffic, might have noticed Frey. As indicated above, however, Frey's assumption of the risk, by using a known defective instrumentality, cannot be ignored. Thus, on the facts of this case, the relative responsibility of each of the parties, despite Frey's assumption of the risk, may be such that sole responsibility cannot be attributed to either of them.

¶ 31 Zimmerman's second argument concerns the trial court's grant of summary judgment in favor of HDMC, however, we previously found this argument to be waived. Zimmerman's third contention is also without merit. While Zimmerman maintains his liability is limited to his $25,000 insurance policy, this claim is based on a non pro-rata release agreement, which prevents only Frey from pursuing a claim against Zimmerman. LHD remains free to bring a contribution claim, and Zimmerman's liability, therefore, is not limited to the proceeds of his insurance policy. As to Zimmerman's final claim concerning his "true financial exposure," this will be addressed in our resolution of Frey's arguments involving delay damages.

▬▬▬ ¶ 32 In his appeal, Frey challenges various aspects of the trial court's award of delay damages. First, he contends the trial court erred in failing to hold LHD and Zimmerman jointly and severally liable for delay damages. We agree. Delay damages become a part of the verdict, and the defendants are thereafter liable for the delay damages in the same manner as the underlying verdict. *Trude v. Martin*, 442 Pa.Super. 614, 660 A.2d 626, 636 (1995), *appeal granted*, 543 Pa. 401, 672 A.2d 279 (1996); *Wirth v. Miller*, 398 Pa.Super. 244, 580 A.2d 1154, 1158–1159 (1990), *appeal dismissed as improvidently granted*, 534 Pa. 278, 632 A.2d 309 (1993); *Tindal v. Southeastern Pennsylvania Transp. Auth.*, 385 Pa.Super. 94, 560 A.2d 183, 189 (1989) (en banc). Zimmerman argues he should not be jointly and severally liable for delay damages because the statute of limitations expired before he was joined as an additional defendant. This argument is without merit because Zimmerman originally was sued within the statute of limitations at No. 88–04363, and that action was later consolidated with the instant matter (N.T., 10/18/95, at 355–356).[11] Zimmerman also maintains he was not responsible for any delay in these proceedings because he offered the limits of his insurance policy, and Frey sought nothing else of him. This may be the case, but the offer was nevertheless insufficient to release Zimmerman's responsibility for delay damages under *Berry v. Anderson*, 348 Pa.Super. 618, 502 A.2d 717 (1986) (en banc). Moreover, although Zimmerman attempts to avoid joint and several liability by relying on *Jazbinsek v. Chang*, 416 Pa.Super. 300, 611 A.2d 227 (1992), this reliance is misplaced. Unlike Zimmerman, the defendant in *Jazbinsek* made a sufficient settlement offer prior to trial. *Id.* 611 A.2d at 229, 231–232.[12]

¶ 33 Frey next contends the trial court erred in reducing delay damages due to delays which he allegedly caused. After Frey filed his motion for delay damages, both LHD and Zimmerman filed answers seeking to exclude the following periods of time: (1) the period between February 24, 1993 and February 10, 1994, due to pend-

---

11. Although Zimmerman was joined as an additional defendant prior to the aforementioned consolidation, he waived any statute of limitations argument by failing to raise it in his answer to LHD's original third-party complaint.

12. We recognize Zimmerman's "true financial exposure" does not include a direct claim by Frey. However, Zimmerman is jointly and severally liable for both the amount of the jury's verdict and the award of delay damages.

ing motions, (2) a period of 64 days due to Frey's alleged delay in discovery, and (3) the period from May 5, 1995 through October 16, 1995, when trial allegedly was delayed at the request of Frey. Despite seeking the above exclusions, LHD then calculated delay damages so as to exclude only one 90–day period due to Frey's alleged refusal to comply with the rules of civil procedure regarding discovery.[13]

¶ 34 Later, Frey admitted delay damages should be calculated from the date the complaint was filed, rather than the date of the praecipe for writ of summons. (Frey's Brief at 11.) At that point, the calculations of LHD and Frey were substantially the same—except for the alleged 90–day delay in discovery.[14,15] Despite the parties' agreement concerning most aspects of delay damages, the trial court thereafter awarded delay damages, which were over $24,000 less than even that indicated by LHD's calculations. The trial court provided absolutely no justification for its award, and no transcript was made of any of the proceedings.

¶ 35 As indicated above, however, since Frey's assumption of the risk relieves LHD from liability in this case, it leaves Zimmerman the sole remaining party to the action to whom liability and damages can be assessed. Therefore, as to delay damages, since LHD is not liable and Zimmerman has settled with Frey, the issue of delay damages is rendered moot.

 ¶ 36 Frey's final claim is trial court error in awarding attorneys' fees and costs due to Frey's failure to disclose his agreement with Zimmerman. As this issue was not raised in a motion for post-trial relief, it is waived. *See* Pa.R.C.P. 227.1, **Post–Trial Relief**; Pa.R.A.P. 302,

**Requisites for Reviewable Issue**, (a) **General Rule**.

¶ 37 Judgment vacated.

¶ 38 Jurisdiction relinquished.

¶ 39 Dissenting Opinion by BECK, J.

BECK, J., dissenting:

¶ 1 I dissent. I would remand this matter for a new trial.

¶ 2 The majority finds that the plaintiff, Rick Frey, assumed the risk. The majority makes this determination as a matter of law, completely overriding the decision of the jury, which considered and rejected the assumption of the risk defense. In doing so, the majority expressly countermands the jury's factual conclusions and even goes so far as to make its own credibility determination as to Frey's own testimony regarding his understanding of the risk he faced.

¶ 3 In my view, the majority has misconstrued the law applicable to assumption of the risk in a strict liability case and has improperly exceeded the authority of an appellate court.

¶ 4 In stark contrast to the majority's disposition of this matter, I would vacate the judgment entered on the jury's verdict and remand for a new trial on the ground that a new and different legal standard applies in determining whether a seller of used, as opposed to new, products is strictly liable. Thus, defendant Lancaster Harley Davidson, Inc. is entitled to a new trial at which the appropriate standard is applied.

I. *Facts and Procedural History*

¶ 5 Plaintiff Rick Frey was injured when the motorcycle he was driving collided with the automobile driven by defen-

---

13. Zimmerman never provided a calculation of delay damages.

14. Although the calculations of LHD and Frey were substantially the same, LHD used the date of the complaint's certificate of service (February 21, 1991), while Frey used the date the complaint was filed (February 26, 1991).

15. Zimmerman never provided any calculation of delay damages and has provided little if any analysis concerning the exclusion of the time periods in question.

dant Donald Zimmerman. The accident occurred during daylight hours under clear, dry conditions. Zimmerman, who was making a left turn onto Route 322 East in Honeybrook, Chester County, stopped at the stop sign, looked for vehicles coming from either direction on Route 322 and, seeing none, began his turn. As he entered the westbound lanes of Route 322, he saw Frey's motorcycle approaching in the westbound lanes. Frey was descending a hill which crested about 500 feet to the east of the intersection. Zimmerman accelerated in an attempt to clear the westbound lanes, but Frey collided with the left rear side of Zimmerman's car, suffering serious injuries including permanent brain damage and vision impairment.

¶ 6 Frey brought this action against Zimmerman and defendant Lancaster Harley Davidson, Inc. ("LHD"), the dealer, which had sold him the used motorcycle he was riding at the time of the accident.[16] Zimmerman was sued under a negligence theory and LHD was sued as a seller of a defective product under a strict liability theory.

¶ 7 The original complaint also contained counts against LHD sounding in negligence and breach of contract. Only the strict liability claim proceeded to trial, however, and no issue regarding other claims raised by Frey in the original complaint have been raised on appeal.

¶ 8 The crux of Frey's action against LHD was the claim that the motorcycle sold to him by LHD had been manufactured with a feature that caused the headlight to light whenever the ignition was turned on, but that this feature had been defeated on the used motorcycle sold by LHD, with the result that the headlight on Frey's bike came on only when the key was turned to the second of two "on" positions. Frey contended that the failure of the headlight to light in both "on" positions made the motorcycle less conspicuous to other drivers when driven with the ignition in the first "on" position. This condition, he asserted, rendered the motorcycle unsafe for its intended use and thus constituted a defect, which caused the accident leading to his injuries.

¶ 9 The matter went to trial before a jury, which concluded in special interrogatories that the motorcycle was in a defective condition when it was sold to Frey, that the defect had been a substantial factor in causing the accident, and that Frey had *not* assumed the risk. The jury also found that Zimmerman was negligent and his negligence was a substantial factor in causing the accident. The jury awarded Frey $750,000 in compensatory damages and allocated liability 55% to LHD and 45% to Zimmerman. Post trial motions were filed in which, *inter alia*, LHD contended that the trial court had erred as a matter of law in holding that LHD as seller of a six-year-old used motorcycle

16. The complaint also named Harley Davidson Motor Co., Inc. ("HDMC"), the motorcycle's manufacturer, as a defendant under a design defect theory. Before trial, HDMC moved for and was granted summary judgment based on a release executed by Frey in a related action in federal court. On appeal, LHD and Zimmerman claim, *inter alia*, that the trial court erred in granting summary judgment to HDMC. This claim, however, is waived. At the time the grant of summary judgment removed HDMC from the case, Pennsylvania law permitted an immediate appeal from an order which put appellant out of court as to a party or claim even if other parties and/or claims remained in litigation. The amendments to Pa.R.A.P. 341 precluding immediate appeals from orders disposing of fewer than all claims and/or parties absent trial court certification do not apply to orders entered prior to March 1, 1994. *See* Note, Pa.R.A.P. 341 (amendments enacted May 6, 1992, effective July 6, 1992, to govern only actions originally commenced after July 6, 1992; Supreme Court Order dated January 10, 1994, made amendments applicable to all orders entered on or after March 1, 1994, regardless of date of commencement of action). As the order granting summary judgment to HDMC was entered on February 10, 1994, it was immediately appealable. When neither LHD nor Zimmerman appealed the summary judgment within 30 days of its entry, they waived any challenge they might have raised to HDMC's removal from the case.

could be held strictly liable for defects in that product to the same extent as the seller of a new motorcycle. Following the denial of post trial motions and the assessment of delay damages, judgments were entered in favor of Frey and against LHD and Zimmerman. These timely appeals followed.

## II. *Assumption of the Risk*

¶ 10 On appeal, LHD first contends that the trial court erred in denying its motions for JNOV. It argues that it was entitled to judgment in its favor because the evidence failed to establish that inconspicuity of the motorcycle was a cause of the accident, because the evidence established that Frey assumed the risk of driving the motorcycle without the headlight lighted, and because the evidence failed to establish that the alleged defect was present when Frey purchased the motorcycle from LHD.

¶ 11 It is on the second of these grounds, assumption of the risk, that the majority bases its decision. The majority specifically rejects the notion that assumption of the risk is a question for the jury, finding that in this case there was "uncontroverted evidence concerning what knowledge could reasonably be imputed to Frey", and that Frey's own testimony that he did *not* even think about the risk posed by driving the motorcycle with its headlight off during the daytime is simply incredible. The majority then proceeds to engage in its own factual analysis, concluding that Frey must be held to have assumed the risk as a matter of law.

¶ 12 Although the majority fails even to state the standard of review applicable to our review of a denial of a judgment notwithstanding the verdict, this standard imposes a crucially important limit on our review of the assumption of the risk analysis. In reviewing such a denial, we are governed by the following well-established principles:

> When reviewing a trial court's denial of a motion for judgment notwithstanding the verdict, "the evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor." *Moure v. Raeuchle*, 529 Pa. 394, 402, 604 A.2d 1003, 1007 (1992). We should not reach a decision based on how we would have voted but on the facts as presented in light of the jury's determinations. *Id.* A judgment n.o.v. is proper if the movant is entitled to judgment as a matter of law or if the evidence was such that no two reasonable minds could disagree that the verdict was improper. *Id.*; *Wasserman v. Fifth & Reed Hospital*, 442 Pa.Super. 563, 577–579, 660 A.2d 600, 604 (1995).

*Struble v. Valley Forge Military Academy*, 445 Pa.Super. 224, 665 A.2d 4, 5–6 (1995).

¶ 13 Applying this standard, the majority's error in finding that Frey assumed the risk as a matter of law, despite the jury's entirely reasonable rejection of this defense, is clear.

¶ 14 Although in recent years the assumption of the risk doctrine has been substantially modified when analyzed in the context of a negligence action, the doctrine has remained unchanged when, as here, assumption of the risk is raised in the context of a strict product liability action. *See Hardy v. Southland Corp.*, 435 Pa.Super. 237, 645 A.2d 839, 842 (1994), *appeal denied*, 539 Pa. 679, 652 A.2d 1324 (1994). In a strict product liability action, assumption of the risk is an affirmative defense to be decided by the jury. Whether a plaintiff has assumed the risk may be determined as a matter of law "only where it is beyond question that the plaintiff voluntarily and knowingly proceeded in the face of an obvious and dangerous condition." *Barrett v. Fredavid Builders, Inc.*, 454 Pa.Super. 162, 685 A.2d 129, 131 (1996). Moreover, merely negligent conduct by the plaintiff in encountering the risk is not enough. A plaintiff has assumed the risk only where it can be con-

cluded that he so clearly knew of and voluntarily encountered the danger, he must be held to have forfeited his right to complain when he suffers injury. *Id.*

¶ 15 In this case, the trial court properly submitted to the jury the question of whether plaintiff Frey assumed the risk, and the jury rejected the defense. The jury's conclusion is entirely reasonable based on the evidence before it. Frey testified that he did not think about the fact that operating his motorcycle with the headlight off during daylight hours posed a risk. The jury believed him. There was no other relevant evidence that makes the jury's conclusion so unreasonable as to warrant either the trial court or this court overturning it. The majority's decision to the contrary, based on its own analysis of the evidence and its own assessment of Frey's credibility, usurps the function of the jury and exceeds this court's authority under the applicable standard of review.

### III. *Strict Liability*

¶ 16 LHD also contends that the trial court erred in instructing the jury on strict liability in that it applied the same stan-

dards for liability to LHD, the seller of a six-year-old used motorcycle with three prior owners, as are applicable to the seller of a new vehicle. LHD argues that this was an error of law and that the public policies which support the imposition of strict liability upon sellers of new products do not support the imposition of liability upon the seller of a used product unless such seller has caused the defect or created an expectation in the consumer that the product poses no greater risk of defect than would a new product. Careful consideration of the competing policy considerations and study of the decisions of our sister states on the issue leads me to the conclusion that LHD is entirely correct.

¶ 17 The concept of strict liability for sale of defective products, as enunciated in Section 402A of the Restatement (Second) of Torts, was adopted as the law of Pennsylvania in *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966).[17] No decision of the Pennsylvania appellate courts, however, has explicitly determined whether that concept applies to sellers of used products.[18]

---

**17.** Section 402A, "Special Liability of Seller of Product for Physical Harm to User or Consumer," provides:
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
Restatement (Second) Torts, § 402A.

**18.** In *Mixter v. Mack Trucks*, 224 Pa.Super. 313, 308 A.2d 139 (1973), this court reviewed a judgment against an additional defendant for indemnification in the context of an action sounding in strict liability against the seller of

a used tractor and in negligence against a party who had repaired the tractor prior to its sale to plaintiff. In that action, the jury returned a verdict in favor of plaintiff and against the seller of the used tractor on the strict liability count. On appeal, however, the applicability of strict liability under Section 402A to the seller of a used product was not at issue; rather the decision of this court focused on whether the additional defendant had properly been ordered to indemnify the seller. *Mixter* thus did not establish a precedent to guide us in our decision of the issues before us in this case.

The U.S. Court of Appeals for the Third Circuit, in a decision applying Pennsylvania law, also reviewed a case in which the underlying action sounded in strict liability against the seller of a used product. In *Josephs v. Harris Corporation*, 677 F.2d 985 (3d Cir. 1982), the court reviewed a judgment in favor of a defendant who had sold an allegedly defective used printing press. The seller of the used press was also its manufacturer. In determining that the trial court had erred in limiting evidence of the alleged defective condition to the date of manufacture rather than

¶ 18 On its face, Section 402A can be read to apply to "any" seller of "any" product in a defective condition that is unreasonably dangerous. However, in developing the law of strict product liability in this Commonwealth, the Supreme Court of Pennsylvania has not adopted such a broad interpretation of Section 402A. While recognizing and endorsing the consumer protection policies that underlie Section 402A, the Court has nevertheless refused to impose strict liability on certain distributors. Rather than automatically imposing strict liability on anyone involved in distributing a product to a consumer, the Court has carefully examined the defendant's relationship with the defective product and the overall chain of distribution. For example, in *Coyle v. Richardson–Merrell, Inc.*, 526 Pa. 208, 212, 584 A.2d 1383, 1385 (1991), the Court held that the policies underlying Section 402A did not support imposing strict liability for failure to warn on a pharmacy that sold an allegedly defective drug. *See also Cafazzo v. Central Medical Health Services, Inc.*, 542 Pa. 526, 668 A.2d 521 (1995) (holding policies underlying Section 402A did not support imposing strict liability on physician who performed surgery to implant defective prosthetic device and hospital where operation was performed); *Musser v. Vilsmeier Auction Co.*, 522 Pa. 367, 562 A.2d 279 (1989) (holding policies underlying Section 402A not served by treating auctioneer as "seller" subject to strict liability); *Nath v. National Equipment Leasing Corp.*, 497 Pa. 126, 439 A.2d 633 (1981) (holding purpose of Section 402A not ad-

vanced by treating financing lessor with only tangential relationship to supply of products as "seller" subject to strict liability); *Cf. Francioni v. Gibsonia Truck Corp.*, 472 Pa. 362, 372 A.2d 736 (1977) (holding policies underlying strict product liability do support extension of strict liability to those who market by lease or bailment as well as sale). Thus, it is clear that in determining the applicability of strict liability to sellers of used products, the social policies underlying Section 402A must be examined and we must decide whether and to what extent those policies are still served where the consumer has chosen to purchase a used product rather than a new one.

¶ 19 The drafters of Section 402A summarized the policies underlying the doctrine of strict liability in Comment c:

On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be ob-

to the date of sale to plaintiff's employer, the appellate court opined

By its express language, § 402A applies to sellers engaged in the business of selling the relevant product. There has been no contention that Harris does not fall within this category. The policy of § 402A is to protect the ultimate user for defects in goods caused by those who put such goods in commerce. Had Harris sold the used press manufactured by another, it would be liable if the product was defective at the time of sale. There is no reason why the fact that Harris was the manufacturer as

well as the subsequent seller should change this result.

677 F.2d at 988. This language assumes, rather than decides, a principle not directly before the court in that case: that Section 402A is applicable to sellers of used products to the same extent as it applies to sellers of new products. We are not bound by the circuit court's decision nor, in light of the merely cursory discussion of the policy issues involved, am I persuaded by its reasoning in making the quoted statement. Accordingly, I do not find *Josephs* instructive in addressing the issues presently before us.

tained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

Restatement (Second) of Torts § 402A Comment c.

¶ 20 The Supreme Court of Pennsylvania has long followed its own four-part test to determine whether the policies underlying Section 402a support the imposition of strict liability on a particular supplier of an allegedly defective and unreasonably dangerous product. As the Court stated in *Cafazzo v. Central Medical Health Services, Inc.*, 542 Pa. at 533–535, 668 A.2d at 525:

The test was posited by this Court in *Francioni v. Gibsonia Truck Corp.*, 472 Pa. 362, 372 A.2d 736 (1977), to determine whether a particular supplier of products, whose status as a supplier is already determined, is to be held liable for damages caused by defects in the products supplied. It was first concluded that a lessor of hauling equipment could properly be considered a supplier after the application of a four part inquiry, which focuses initially on which members of the marketing chain are available for redress; then asks whether imposition of liability would serve as an incentive to safety; whether the supplier is in a better position than the consumer to prevent the circulation of defective products; and, finally, whether the supplier can distribute the cost of compensation for injuries by charging for it in his business.

*Id.* at 368–369, 372 A.2d at 739.

¶ 21 Applying this test to a supplier of used products leads me to conclude that strict liability for the sale of a defective used product should be imposed only under limited and well-defined circumstances. Sellers and consumers of used products participate in a marketplace that is significantly different from the market for new products. In the used products or secondary market, sellers have far less knowledge of and control over the safety of the products they sell. The seller has not manufactured the product, usually has not acquired it from anyone in the original and direct chain of distribution, and may well have no information concerning the product's original condition or how it has been used or altered since it was new. As a result, used product dealers customarily do not make representations concerning the condition of their products. By the same token, consumers of used products do not expect the condition of such goods to rival that of new products. In recognition of these differences, dealers in used products charge and consumers pay appreciably lower prices. These lower prices are the market's mechanism for reflecting the age and condition of the product and the understanding of both parties that the product is not represented or expected to be like new. In other words, dealers do not make extensive representations regarding the operation or fitness of the product and consumers are willing to accept the product "as is" because the price is right. Moreover, used products that retain some usefulness are available to consumers who would not otherwise be able to obtain them at new product prices.

¶ 22 To inject the far-reaching strict product liability principles that apply to sellers of new products into the well-established secondary market would substantially disrupt that market. It would require used product dealers, which are often relatively small businesses, to acquire greater knowledge of the condition of their products and either repair or warn about every conceivable defect a product might have. However, since no such inspection or repair or warning will insure the safety of a product that has been subjected to deterioration through use and age, sellers of used products would nevertheless be compelled to insure against the risk of strict liability for defects that render their products unreasonably dangerous. The expense of satisfying these new obligations of inspection,

repair, warning and insurance either would be passed on to the consumer or would drive the small used goods dealer out of business. In turn, consumers would be forced to pay higher prices for fewer available used goods.

¶ 23 Moreover, the economic impact of such a disruption of the secondary market would not be justified by any material advance in the safety of used products. Most dealers in used products cannot and/or do not influence the safety related decisions of the original manufacturers and distributors of those products when new because there is no relationship between those sellers who initially put the product into the stream of commerce and those who redistribute it much further downstream. Thus, to impose strict product liability would merely impose a burden on used product dealers that many could not bear while decreasing the availability of reasonably priced used goods for consumers who depend on the secondary market.

¶ 24 However, I recognize the general public policy of protecting consumers from defective products. Of course, a seller of used products whose failure to exercise reasonable care causes a defect or fails to eliminate a defect may be liable under a negligence theory. In addition, where a purchaser of a used product can establish that the seller remanufactured the product, the seller should be treated as a manufacturer and held strictly liable for defects just as the original manufacturer of the products would be. Lastly, if the seller has created in the buyer an expectation that the used product presents no greater risk of defect than a new one, he or she should be held to the standards applicable to new products, including the application of strict liability for defects. By thus imposing strict product liability on a seller of used goods whose own conduct in either remanufacturing the product or heighten-

ing the expectations of the dealer's consumer, we both protect consumers and provide an incentive for such dealers to guarantee the safety of their products.

¶ 25 In considering the degree to which sellers of used products should be held strictly liable for the sale of defective and unreasonably dangerous products, I have been guided both by the analysis of this issue ·reflected in Section 8 of the American Law Institute's recently released Restatement of the Law Third, Torts: Products Liability, and by the decisions of the courts of other jurisdictions that have analyzed this issue.

¶ 26 Section 8 of the new Restatement, *"Liability of Commercial Seller or Distributor of Defective Used Products,"* Restatement (Third) of Torts: Products Liability § 8,[19] provides:

> § 8. Liability of Commercial Seller or Distributor of Defective used Products
>
> One engaged in the business of selling or otherwise distributing used products who sells or distributes a defective used product is subject to liability for harm to persons or property caused by the defect if the defect:
>
> (a) arisès from the seller's failure to exercise reasonable care; or
>
> (b) is a manufacturing defect under § 2(a) [defining "manufacturing defect" as a departure from a product's intended design despite the exercise of all possible care in its preparation and marketing] or a defect that may be inferred under § 3 [permitting defect to be inferred when the incident harming plaintiff was of the kind that ordinarily occurs as a result of product defect and was not, in the particular case, solely the result of causes other than product defect] and the seller's marketing of the

19. We need not, in the context of this case, go so far as to adopt the language of Section 8 as the law of the Commonwealth. Indeed, such a step is much more appropriately undertaken by our Supreme Court. However, I have found the language of Section 8 itself and the analysis contained in the comments and reporters' notes thereto extremely helpful in considering the difficult issues before us in this case.

product would cause a reasonable person in the position of the buyer to expect the used product to present no greater risk of defect than if the product were new; or

(c) is a defect under § 2 [defining manufacturing defects, design defects and defects due to inadequate instructions or warnings] or § 3 in a used product remanufactured by the seller or a predecessor in the commercial chain of distribution of the used product; or

(d) arises from a used product's noncompliance under § 4 [entitled *Noncompliance and Compliance with Product Safety Statutes or Regulations*] with a product safety statute or regulation applicable to the used product.

A used product is a product that, prior to the time of sale or other distribution referred to in this Section, is commercially sold or otherwise distributed to a buyer not in the commercial chain of distribution and used for some period of time.

Restatement (Third) of Torts: Products Liability § 8.

¶ 27 In essence, this section limits recovery from a seller of a defective product who resells the product without making any substantial change to it or any representation as to its quality to negligence standards. A plaintiff may recover from such a seller only if it is shown that the seller failed to exercise reasonable care by engaging in conduct that introduces defects into the product or that allows defects to remain when reasonable care would have eliminated them. *See* Restatement (Third) of Torts: Products Liability § 8(a), Comments b, e. In contrast, a seller who creates in the consumer an expectation that the used product is "like new" may be held strictly liable for mechanical defects in much the same way as the manufacturer of a new product, but is not exposed to liability for design defects and failure to instruct about or warn of defects as are those in the original chain of product distribution. Restatement (Third) of

Torts: Product Liability § 8(b), Comments b,f,g. In addition, the seller who has remanufactured a product is exposed to liability for defects of any type in the same manner as the seller of a new product. Restatement (Third) of Torts: Products Liability § 8(c), Comments b, i.

¶ 28 In formulating this theory of limited strict liability for used products dealers, the drafters of the new Restatement took account of the selfsame realities concerning the operation of the secondary market that have persuaded me to craft a limited strict liability rule for these sellers:

Consumers of most used products sold in obviously used condition typically do not, and should not, expect those products to perform as safely, with respect to the possibility of mechanical defects, as when those products were new. Many factors affect consumer expectations in this regard. For example, the age and condition of used products and the commensurate lower prices paid for such products alert reasonable buyers to the possibility of defects and the need to monitor the safety aspects of such products over time according to their age and condition. Given the awareness of buyers generally regarding the risks of harm presented by used products in varying stages of physical deterioration, primary responsibility for allocating these risks may, in the absence of fault on the part of the used-product seller or some special circumstance that justifies strict liability, be delegated to commercial markets for used products, in which the terms of sale vary widely depending on the apparent condition of such products at the time of sale.

*Id.,* Comment c.

¶ 29 Moreover, the drafters of Section 8 expressly recognized that sellers of used products do not have the same relationships with those who are above them in the chain of distribution as do sellers of new products:

Retailers of new products have opportunities, as used-product sellers generally do not, to contract with those above them in the chain of distribution regarding who should ultimately bear the costs of defending design claims in court and paying successful claimants. Holding new-product retailers liable for defective designs originating at manufacture encourages them to apply pressure on manufacturers ... to produce safe products and to adopt reasonable designs. In contrast, sellers of like-new used products are not, except coincidentally, members of the original distributive chain. Typically they exercise little if any control over original design choices or decisions regarding indemnity for costs of liability.

*Id.*, Comment b.

¶ 30 My view of the appropriate limits to be placed on the strict liability of sellers of used products is also reflected in the decisions of numerous other courts that have confronted this issue. While some jurisdictions have concluded that strict liability should be extended to sellers of used products, many others have held that unless the seller has substantially repaired or modified the product, negligently caused the defect, or made some representation regarding the product's quality, the policies underlying the doctrine do not warrant its application to sellers of used products. *See generally* Annotation, *Products Liability: Application of Strict Liability Doctrine to Seller of Used Product,* 9 A.L.R. 5 [th] 1.[20]

¶ 31 In reaching this conclusion, these courts have also emphasized the material differences between the position of sellers of new and used goods and the equally significant differences in the expectations of their customers and the prices they pay. They, as I, have recognized the social and economic utility of a thriving secondary market that makes a wide range of useful products available to members of the public who might not be able to afford new goods and averts the waste which might otherwise occur if still-useful products were merely discarded by the original purchaser when they became worn, unwanted or were replaced by newer models. *See Harber v. Altec Industries, Inc.,* 812 F.Supp. 954, 963–64 (W.D.Mo.1993), *aff'd,* 5 F.3d 339 (8th Cir.1993); *Tillman v. Vance,* 286 Or. 747, 755, 596 P.2d 1299, 1303–1304 (1979) (recognizing "the flexibility of this kind of market appears to serve legitimate interests of buyers as well as sellers.").

¶ 32 In addition, those courts that have refused to apply broad strict liability to dealers in used products have noted that because of the position of such sellers in the overall chain of product marketing and distribution, they are not ordinarily involved in the marketing of any particular brand or manufacturer of goods and do not customarily have established relationships with manufacturers which would enable them to influence the manufacturer to produce a safer product. *See Harber, supra;* *Peterson v. Superior Court,* 10 Cal.4th 1185, 43 Cal.Rptr.2d 836, 899 P.2d 905 (1995) (citing *La Rosa v. Superior Court,* 122 Cal.App.3d 741, 176 Cal.Rptr. 224 (1981)); *Keith v. Russell T. Bundy & Assoc., Inc.,* 495 So.2d 1223 (Fla. 5th Dist.

**20.** Courts that have held that sellers of used products are strictly liable for all product defects have generally focused on the fact that such sellers, although not part of the original chain of product distribution, nevertheless participated in the process by which the product reached the consumer and, therefore, under an enterprise liability theory, are responsible for all harms resulting from its use. *See Jordan v. Sunnyslope Appliance Propane & Plumbing Supplies Co.,* 135 Ariz. 309, 660 P.2d 1236 (1983); *Turner v. International Harvester Co.,* 133 N.J.Super. 277, 336 A.2d 62 (1975); *Hovenden v. Tenbush,* 529 S.W.2d 302 (Tex.Civ.App.1975). Such courts have also noted that despite their more minor role in the marketing process, dealers in used products remain more able than consumers to distribute the costs and other losses arising from defective products. *See Turner, supra; Thompson v. Rockford Machine Tool Co.,* 49 Wash.App. 482, 744 P.2d 357 (1987); *Nelson v. Nelson Hardware, Inc.,* 160 Wis.2d 689, 467 N.W.2d 518 (1991).

Ct.App.1986); *Peterson v. Lou Bachrodt Chevrolet Co.*, 61 Ill.2d 17, 329 N.E.2d 785 (1975); *Tillman*, 286 Ore. at 756, 596 P.2d at 1304 ("[A]ny risk reduction which would be accomplished by imposing strict liability on the dealer in used goods would not be significant enough to justify our taking that step. The dealer in used goods generally has no direct relationship with either manufacturers or distributors. Thus, there is no ready channel of communication by which the dealer and the manufacturer can exchange information about possible dangerous defects in particular product lines or about actual and potential liability claims.").

¶ 33 Finally, these courts have recognized the degree to which application of broad 402A liability on used products dealers would burden them with the need to inspect and repair, which might prove so costly as to drive some such dealers out of business. *See Harber*, 812 F.Supp. at 962–63 ("The argument that imposing strict liability will increase the safety of such goods because the dealer will use increased care in inspecting and servicing the goods is without merit in relation to latent defects.... Even if a dealer in used goods were to inspect its products, latent defects would not be found and injuries would not be prevented. Defects could only be found through vigorous inspection and dismantling of the products, but that procedure would dramatically change the used-goods market. Every dealer in used goods would be forced to become a reconditioner of products. Each product would have to be taken apart and rebuilt before sale to try to avoid liability. The cost imposed would be tremendous. The used-goods market would no longer be able to meet the needs of low-cost seeking consumers."); *Peterson v. Superior Court*, 10 Cal.4th at 1201, 43 Cal.Rptr.2d 836, 899 P.2d at 914 (" 'To impose such liability would as a practical matter require all dealers in used goods routinely to dismantle, inspect for latent defects, and repair or recondition their products.... It would in effect render used goods dealers as

insurers against defects which came into existence after the original chain of distribution and while the product was under the control of previous consumers.' ") (quoting *Wilkinson v. Hicks*, 126 Cal. App.3d 515, 521, 179 Cal.Rptr. 5, 8 (1981) (citations omitted)).

¶ 34 Upon careful consideration of this issue and review of both the new Restatement and the substantial body of divergent case law from our sister states, I would hold that public policy in Pennsylvania does not support the application of strict liability to sellers of used products who do not remanufacture the product or otherwise create a heightened reasonable expectation in the consumer.

¶ 35 Because I have determined that sellers of used products may not be held strictly liable except under these limited circumstances, and because the jury in the instant case was instructed that it must hold LHD liable if they found that it sold the motorcycle in a defective condition which caused Frey's injuries, it is clear that a new trial must be granted as to LHD. Moreover, because the jury apportioned fault between LHD and Zimmerman and LHD's share of the liability, if any, may change upon retrial with proper instructions, Frey's case against Zimmerman must be retried as well.

¶ 36 Accordingly, I would vacate the judgments entered on the jury's verdict and remand for a new trial in which the jury should be instructed in accordance with the principles outlined in this opinion.