610 A.2d 446

**Agnes HATFIELD and Herbert Hatfield,
Her Husband, Appellees,**

v.

**CONTINENTAL IMPORTS, INC. and Marvin Gross
and Leonard Gross, Individually and Trading
as Warehouse Imports, Appellees.**

**Appeal of TALIN INDUSTRIA ARREDAMENTI, S.P.A.**

Supreme Court of Pennsylvania.

Argued Dec. 5, 1991.

Decided May 20, 1992.

552

Raymond J. Quaglia, Philadelphia, for appellant.

Bruce W. McCullough, Philadelphia, for appellees Cont. Imports, Inc., et al.

James L. Womer, Havertown, for appellees Agnes Hatfield, et ux.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION

McDERMOTT, Justice.

In this case we are called upon to determine the admissibility into evidence of a so-called "Mary Carter agreement."[1] The underlying facts and procedural history are as follows.

On April 15, 1978, appellee Agnes Hatfield sustained injuries when the chair upon which she was sitting collapsed. On February 6, 1980, Mrs. Hatfield and her husband, Herbert, initiated an action, sounding in negligence and products liability, against appellee Continental Imports, Inc. (Continental), and appellees Marvin Gross and Leonard Gross, individually and trading as Warehouse Imports (Gross). Thereafter, appellees Continental and Gross (the original defendants) joined as an additional defendant appellant Talin Industria Arredamenti, S.P.A. (Talin), an Italian manufacturer alleged to have built the defective chair.

---

1. The name is derived from a Florida District Court of Appeals case in which, apparently, agreements of the type described hereinafter were reviewed first by an appellate court. *See Booth v. Mary Carter Paint Co.,* 202 So.2d 8 (Fla.Dist.Ct.App.1967) *overruled* on other grounds in *Ward v. Ochoa,* 284 So.2d 385, 387 (Fla.1973).

On June 20, 1983, appellees Agnes and Herbert Hatfield, as plaintiffs, and Hartford Mutual Insurance Company (Insurer), as liability insurer for the original defendants, executed an eleven page document entitled "Settlement Agreement and Release" (Agreement). The Agreement provided, *inter alia*, that the Insurer would pay the Hatfields two lump sum payments totalling $100,000 and make additional payments of $833.33 per month for the rest of Mrs. Hatfield's life. The Agreement also contained the following paragraph, which has become the focal point of the dispute herein, to wit:

> In addition to the foregoing, the Plaintiffs also agree to pursue an action against Talin Industries Arredament (sic). If the action against Talin Industries Arredament (sic) is successful the Plaintiffs will return $50,000 to Releasees [Insurer and the original defendants] free and clear of all fees and expenses except that releasors agree to pay 50% of the expenses of the litigation against Talin Industries Arredament (sic) incurred after the signing of this release. If Releasees [2] are able to settle their claim against Talin Industries Arredament (sic) prior to trial they will return to the Releasees $25,000 free and clear of all fees and expenses.

Thereafter, the Hatfields pursued their action against Talin. A jury trial was scheduled to commence on October 25, 1988. Prior to the commencement of trial, Talin filed a motion in limine seeking permission to introduce the Agreement into evidence. The trial court reviewed the Agreement, focusing on the above-quoted paragraph, and determined: "In the interests of fairness and justice, to ensure that the jury weighs the credibility of the witnesses, and properly determines liability, the jury must be apprised of the settlement agreement." Slip op. December 7, 1988

2. The term "releasees" is defined in the Agreement as Insurer and the original defendants; the term "releasors" is not defined. Although the drafters apparently misused the words "releasees" and "releasors" at times, it is clear that the Hatfields were responsible for litigating or settling the case against Talin and Insurer and the original defendants agreed to pay 50% of the expenses of litigation.

Court of Common Pleas of Philadelphia, p. 7, No. 623, Feb. 1980.

Upon request by the Hatfields and the original defendants, the trial court granted permission to take an interlocutory appeal. The Superior Court afforded the parties interlocutory review. *See* 42 Pa.C.S. § 702(b); Pa.R.A.P. 1311.

On appeal, a panel of the Superior Court reversed the trial court's decision,[3] holding that the introduction into evidence of the Agreement would be violative of 42 Pa.C.S. § 6141,[4] the statutory proscription against the admissibility of settlement agreements. Upon petition by Talin, we granted allocatur [5] to address the admissibility into evidence of documents like the Agreement, which apparently are becoming more prevalent throughout the nation.[6]

The eponymous "Mary Carter agreements" arise when, in a setting of multiple defendants, one or more, but less than all, of the defendants reach an agreement with the plaintiff, but wish to retain some interest in the outcome of the litigation. Although there are as many variations as there are creative lawyers, these agreements usually have the following features:

(1) the agreeing defendant(s) guarantees the plaintiff a minimum payment, often the limit of defendant's liability insurance;

(2) the plaintiff agrees not to enforce against the agreeing defendant(s) any subsequent judgments;

(3) the agreeing defendant(s) remains a part of the action and payments to plaintiff are reduced if money is recovered, by settlement or judgment, from the non-agreeing defendant(s); and

3. *See* 396 Pa.Super. 309, 578 A.2d 530 (1990).

4. Act of July 9, 1976, P.L. 586, No. 142, Section 2, effective June 27, 1978.

5. *See* 527 Pa. 603, 589 A.2d 693 (1991).

6. *See* Note, *It's a Mistake to Tolerate the Mary Carter Agreement,* 87 Colum.L.Rev. 368 (1987).

(4) the agreement is "secret" in that there is an understanding that it will not be disclosed unless required by rules of court or a court of competent jurisdiction.[7]

The Agreement under review clearly contains the first three features cited above: the original defendants agreed to pay the Hatfields $100,000 and monthly payments as the total amount of potential liability, with the understanding that the original defendants would receive a rebate of $50,000 (less one-half of the Hatfields' legal fees) if the action against Talin "is successful" or a rebate of $25,000 if a settlement is reached with Talin.

Appellees, however, argue that the Agreement is not a "Mary Carter agreement" because it was not a "secret" agreement, citing the fact that the Agreement was made part of the record by virtue of original defendants' Amended Answer With New Matter which was filed in June, 1983.

For purposes of this opinion, whether the Agreement is characterized as a "Mary Carter agreement" is of no moment. We are only concerned with whether agreements such as the one under consideration here, called by any name, are admissible into evidence. The fact that similar agreements have been categorized and analyzed under a handy rubric in other jurisdictions [8] and in legal periodicals [9] is a convenient research tool but certainly not a dispositive answer to the admissibility or non-admissibility of a particular agreement.

■ We begin our analysis with the basic principle that relevant evidence is admissible unless it is shown to come within a rule which makes it inadmissible. *See Clark v.*

7. *See id.* generally and *Maule Industries v. Rountree,* 264 So.2d 445, 447 (Fla.Dist.Ct.App.1972), *overruled* on other grounds *Ward v. Ochoa,* 284 So.2d 385, 387 (Fla.1973).

8. *See,* e.g., *General Motors Corp. v. Lahocki,* 286 Md. 714, 410 A.2d 1039 (1980), *Lum v. Stinnett,* 87 Nev. 402, 488 P.2d 347 (1971), *Reese v. Chicago, B. & Q. R.R.,* 55 Ill.2d 356, 303 N.E.2d 382 (1973).

9. *See,* e.g., footnote # 6, *supra* and Comment, *Mary Carter Agreements: Unfair and Unnecessary,* 32 S.W.L.J. 779 (1978); Comment, *Blending Mary Carter's Colors: A Tainted Covenant,* 12 Gonzaga L.Rev. 266 (1977).

*Essex Wire Corp.*, 361 Pa. 60, 63 A.2d 35 (1949). In determining the relevancy of evidence, we have held as follows: "Evidence is relevant if it tends to make a fact at issue more or less probable." *Martin v. Soblotney*, 502 Pa. 418, 422, 466 A.2d 1022, 1024 (1983).

■ The "fact at issue" in the instant case is the potential bias of the original defendants. Appellant argues that the existence of an agreement pursuant to which the original defendants would be partially reimbursed if Talin is found liable lends a bias to the original defendants' interest in the case which is contrary to what would be perceived as their "normal" interest. Specifically, the additional defendant is arguing that the original defendants are no longer interested in defeating plaintiff's claim; rather they are interested in actually fostering plaintiff's case. Thus, instead of the defendants being allies against the plaintiff, the plaintiff and the original defendants are now allied against the additional defendant; and it is appellant's position that such information should be conveyed to the jury.

■ As a general proposition, "any witness may be impeached by showing his bias or hostility, or by proving facts which would make such feelings probable." *Commonwealth v. Collins*, 519 Pa. 58, 64, 545 A.2d 882, 885 (1988). Consistent with this proposition, we have previously permitted inquiry into the connection between a witness's credibility and that witness's potential responsibility for reimbursement, which responsibility was dependent upon the outcome of the trial. *See Profit–Sharing Blue Stamp Co. v. Urban Redevelopment Authority of Pittsburgh*, 429 Pa. 396, 241 A.2d 116 (1968).

In accord with the foregoing, we agree with appellant that the Agreement is certainly relevant in tending to show the original defendants' bias. This determination, however, does not end the investigation; for we must now determine whether the Agreement, though relevant, falls "within a rule which makes it inadmissible." *See Clark v. Essex Wire Corp.*, *supra* 361 Pa. at 68, 63 A.2d at 38.

Appellees contend that section 6141 of Title 42 is such a rule. Appellant, on the other hand, argues that, on public policy grounds, we should establish an exception to the otherwise operative statutory rule that settlements are not admissible into evidence. However, resolution of this case does not depend on the embracing of either of these positions.

Section 6141 reads in relevant part, as follows:

**§ 6141. Effect of certain settlements**

(a) **Personal injuries.**—Settlement with or any payment made to an injured person or to others on behalf of such injured person with the permission of such injured person or to anyone entitled to recover damages on account of injury or death of such person shall not constitute an admission of liability by the person making the payment or on whose behalf the payment was made, unless the parties to such settlement or payment agree to the contrary.

(b) **Damages to property.**—Settlement with or any payment made to a person or on his behalf to others for damages to or destruction of property shall not constitute an admission of liability by the person making the payment or on whose behalf the payment was made, unless the parties to such settlement or payment agree to the contrary.

(c) **Admissibility in evidence.**—Except in an action in which final settlement and release has been pleaded as a complete defense, any settlement or payment referred to in subsection (a) and (b) shall not be admissible in evidence on the trial of any matter.

42 Pa.C.S. § 6141.

Whenever we are confronted with a question of statutory interpretation we are guided in our analysis by the Statutory Construction Act of 1972.[10] That Act provides in relevant part as follows:

§ 1903. Words and phrases.

10. Act of Dec. 6, 1972, P.L. 1339, No. 290 § 3.

(a) Words and phrases shall be construed according to rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition.

1 Pa.C.S. § 1903.

§ 1921. Legislative intent controls.

(a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly.

(b) When the words of a statute are clear and free from ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

. . . .

(4) The object to be attained.

. . . .

(6) The consequences of a particular interpretation.

1 Pa.C.S. § 1921.

§ 1922. Presumptions in ascertaining legislative intent. In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used.

(1) That the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable.

. . . .

(5) That the General Assembly intends to favor the public interest as against any private interest.

1 Pa.C.S. § 1922.

§ 1924. Construction of titles, preambles, provisos, exceptions and headings.

The title and preamble of a statute may be considered in the construction thereof. Provisos shall be construed

to limit rather than to extend the operation of the clauses to which they refer. Exceptions expressed in a statute shall be construed to exclude all others. The headings prefixed to titles, parts, articles, chapters, sections and other divisions of a statute shall not be considered to control but may be used to aid in the construction thereof.

1 Pa.C.S. § 1924.

■ Thus, our first inquiry must be directed to ascertain the primary purpose of the statute, or, in the words of the Act, "the object to be attained." 1 Pa.C.S. § 1921(c)(4).

■ Although this Court has not previously had occasion to review this statutory section, the United States District Court for the Eastern District of Pennsylvania accurately described the policy underlying this statute, as well as a similar Federal Rule of Evidence,[11] as being a means to encourage settlements. *See Young v. Verson Allsteel Press Co.*, 539 F.Supp. 193 (E.D.Pa.,1982). Moreover, the ancestry of the statutory section lies in the long honored common rule that, on public policy grounds, offers of settlement and compromise are not generally admissible. *See Rochester v. Machinery Corp. v. Mulach Steel*, 498 Pa. 545, 449 A.2d 1366 (1982) and *Schlosser v. Weiler*, 377 Pa. 582, 105 A.2d 331 (1954) (settlements in matters of dispute are favored by the law).

**11.** Rule 408. Compromise and Offers to Compromise
    Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.
    Fed.R.Evid. 408.

■ Next, we turn to the words of the statute.[12] For purposes of this case, the key word in the statute is "settlement." The appellant, appellees and the courts below consistently refer to the Agreement in this case as a "settlement agreement." The question which now must be answered is whether the Agreement is in fact a "settlement" within the terms of the statute.

A "settlement" has been defined as "an agreement by which parties having disputed matters between them reach or ascertain what is coming from one to the other ..., to fix or resolve conclusively; to make or arrange for final disposition." Black's Law Dictionary 1372 (6th ed. 1990). This Agreement, when viewed in its entirety, can hardly be described as a conclusive resolution or final disposition of the disputed matters between the plaintiffs and the original defendants. Rather, it is merely the first act in a two-act play, and matters between them will not be conclusively resolved or finally disposed until the final curtain has come down.

■ We recognize that the drafters of the Agreement entitled it "Settlement Agreement and Release": however, calling a thing something does not make it so. *See Fidelity Title & Trust Co. v. Metropolitan Life Insurance Co.,* 305 Pa. 296, 157 A. 614 (1931). Considering the paragraph quoted in full above, the Agreement would more accurately be described as a Settlement and Reimbursement Agreement.

Certainly if the plaintiffs had reached an accord with Talin, and then failed or refused to reimburse the original defendants in accordance with the terms of the Agreement, the original defendants would be in court emphasizing the reimbursement portion of the Agreement, and it is that

12. We note that the heading of the statute is "Effect of *certain* settlements." (emphasis added). The Statutory Construction Act advises that a statute's heading may be used to aid in the statute's construction but is not controlling. 1 Pa.C.S. § 1924.

portion with which we are presently most concerned. The inclusion of the reimbursement provisions in the Agreement certainly renders this instrument distinct from the type of agreements referred to in the statute because it changes the nature of the Agreement from a final resolution of matters between the parties to an ongoing relationship, thereby implicitly joining nominal adversaries in an alliance against the remaining defendant. This has the effect of distorting the adversarial process assumed by the trier of fact to exist. For these reasons we do not interpret section 6141 as a rule which makes the agreement per se "inadmissible".[13]

This is not to say that agreements such as these should be admitted into evidence *in toto*. The court, as with all proffered evidence, should review the agreement, balance the relevancy of it against the potential prejudice, and, exercising judicial discretion, admit or exclude as much as it deems appropriate.[14] However, where an agreement clearly allies two or more parties against another, such that a clear potential for bias exists which would not otherwise be apparent to the factfinder, that part of the agreement, or at least the existence of the reason for the potential bias, must be conveyed to the factfinder.[15]

Under the facts of this case this means that the jury is entitled to be instructed as to the financial interests which the original defendants retain in plaintiffs' success.

13. *See Clark v. Essex Wire Corp.*, 361 Pa. 60, 63 A.2d 35 (1949).

14. The concurring opinion "strongly disagree[s] with the conclusion that the actual dollar amount of the settlement agreement is admissible into evidence at trial." Concurring Opinion at 452. We have not held that the dollar amount is necessarily admissible; rather, we have held that the trial court, in considering the extent of disclosure of any such agreement, should balance the relevancy of the evidence against the potential prejudice.

15. Nothing in this opinion is intended to alter the practice applicable to a joint tortfeasor settlement which does not realign the parties. *See* 42 Pa.C.S. § 8326. Thus a joint tortfeasor settlement which simply settles the issue between plaintiffs and one of a number of defendants will still be subject to the provisions of Section 6141, 42 Pa.C.S. § 6141.

Accordingly, the order of the Superior Court is reversed and the case remanded to the trial court for proceedings consistent with this opinion.

CAPPY, J., files a concurring opinion in which LARSEN and PAPADAKOS, JJ., join.

CAPPY, Justice, concurring.

I concur in the result reached by the majority. I agree that the jury in this case should be apprised of the existence of the Agreement and should be instructed as to the amount of reimbursement which the original defendants will recover if the Hatfields are successful in their action against Talin. I disagree with the majority's re-characterization of the Agreement as something other than a "Settlement Agreement" in order to admit it into evidence. Further, I strongly disagree with the majority's conclusion that the actual dollar amount of the settlement agreement is admissible into evidence at trial. Simply stated, I would allow the Agreement into evidence for impeachment purposes as outlined below, except for that part which discloses the total dollar settlement amount.

At the outset, I wish to make clear that I concur with the majority that it is not crucial to our determination whether the Agreement is characterized as a "Mary Carter Agreement." [1] The only issue with which we are concerned is whether the Agreement in this case is admissible under 42 Pa.C.S.A. § 6141(c).

The language of Section 6141(c) is clear; settlement agreements are not admissible in evidence on the trial of any matter unless such settlement has been pleaded as a

1. The term "Mary Carter Agreement" was coined in a Florida Supreme Court case entitled *Ward v. Ochoa,* 284 So.2d at 387 (Fla.1973). A Mary Carter Agreement is a secret agreement that the defendant must remain in the action and will pay the plaintiff a certain monetary recovery regardless of the outcome of the action and will have his or her own maximum liability diminished proportionately by increasing the liability of the other co-defendants.

complete defense.[2] The public policy behind Section 6141(c), as the majority correctly points out, is to encourage settlements. *Muhammad v. Strassburger, McKenna, Messer, Shilobod & Gutnick,* 526 Pa. 541, 587 A.2d 1346 (1991). This policy is an administrative one and serves the purpose of settling disputes without long and costly litigation.

There is however, another public policy at stake in this case, that being the right of a party against whom a witness is called to show that such witness has an interest in or is biased as to the outcome of the trial. This policy is a substantive one that impacts on the basic fairness of the trial.

It is well-established in this jurisdiction that a party against whom a witness is called always has the right to test the credibility of such witness. *Commonwealth v. Williams,* 524 Pa. 218, 570 A.2d 75 (1990); *Downey v. Weston,* 451 Pa. 259, 301 A.2d 635 (1973). The credibility of a witness may be tested by evidence which tends to show that the witness had an interest in the outcome of the trial, that the witness' testimony may be untruthful or that the witness may possess a bias which colors his testimony. *Commonwealth v. Butler,* 601 A.2d 268 (1991); *Grutski v. Kline,* 352 Pa. 401, 43 A.2d 142 (1945). The potential for misleading and deceiving the jury if the credibility of a witness is not allowed to be tested is obvious.

When two public policies conflict it is the job of the judiciary to balance both policies and make a determination as to which one is paramount. This process is illustrated in *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). In *Davis,* the defendant sought to impeach the credibility of a crucial prosecution witness by showing that his probationary status as a juvenile delinquent might subject him to undue pressure from the police with respect to his testimony. The prosecution sought a protective order to prevent any reference to the witness' juvenile record. The

---

2. In the instant case, the Agreement is not being offered into evidence as a complete defense to the action. It is being offered in evidence to impeach the credibility of the original defendants' testimony.

Supreme Court of the United States held that the Sixth Amendment right of confrontation of witnesses requires that the defendant be permitted to impeach the credibility of the prosecution witness by cross-examination directed at possible bias which resulted from the witness' probationary status as a juvenile delinquent notwithstanding that such impeachment would conflict with the state's interest in preserving the confidentiality of juvenile delinquents.

Just as the Supreme Court of the United States employed a balancing test to determine that the right of confrontation is paramount to the State's policy of protecting a juvenile offender, so too must we balance the competing interests at play in this case. It is my view that the danger inherent in not allowing Talin to impeach the credibility of the original defendants by introducing the Agreement in evidence during cross-examination outweighs the administrative policy of encouraging settlements. By allowing Talin the opportunity to show that the original defendants stand to gain $50,000.00 if the Hatfields are successful in their suit against Talin, the jurors will be afforded a basis for determining whether the original defendants' testimony is credible or biased. Such determination is necessary to ensure a fair and just trial.

Because it is the reimbursement that provides the impetus for the testimony of the original defendants to be biased and which is probative of the possible extent of the bias, I concur with the majority that "the jury is entitled to be instructed as to the financial interests which the original defendants retain in [the] plaintiffs' success." However, what the majority has left unsaid, but which follows from my analysis, is that the full dollar amount of the *settlement* should not be introduced in evidence. The settlement amount is not relevant to the issue of the credibility of the original defendants. The original defendants will not gain or lose anything with respect to the settlement amount regardless of how they testify at the trial. Introducing the dollar settlement amount could serve to unduly influence the jury and usurp their function, which is to independently

determine the amount of damages in the event that they find Talin liable to the Hatfields, based solely upon the facts in evidence.

For the foregoing reasons, I would reverse the opinion of the Superior Court and remand the case to the Court of Common Pleas of Allegheny County for proceedings consistent with this opinion.

LARSEN and PAPADAKOS, JJ., join in this concurring opinion.