Irene V. KOSMACK and Norman C. McGaughey, Administrators of the Estate of Joseph George Kosmack, Deceased, Irene V. Kosmack and Norman C. McGaughey, Administrators of the Estate of Jayne Ann Kosmack,

Deceased; David Scott Carter and Norman C. McGaughey, Administrators C.T.A. of the Estate of Phyllis Jane Ward, deceased, David Scott Carter, Administrator of the Estate of Mary Ward Carter, deceased,

v.

James C. JONES, an individual and National Freight, Inc., a corporation,

v.

Pennsylvania Department of Transportation, Appellant,

Thomas A. Gaudlip and Linda Gaudlip,

v.

Irene V. Kosmack and Norman C. McGaughey, Administrators of the Estate of Joseph George Kosmack, Deceased, Irene V. Kosmack and Norman C. McGaughey, Administrators of the Estate of Jayne Ann Kosmack, Deceased; David Scott Carter and Norman C. McGaughey, Administrators C.T.A. of the Estate of Phyllis Jane Ward, deceased, David Scott Carter, Administrator of the Estate of Mary Ward Carter, deceased; Joseph G. Kosmack, Thomas A. Gaudlip, Brian Albright, Bruce Eberhart, James C. Jones, National Freight, Inc. and Pennsylvania Department of Transportation,

Appeal of Pennsylvania Department of Transportation.

Commonwealth Court of Pennsylvania.

Argued May 8, 2001.
Decided Aug. 26, 2002.
Reconsideration and Reargument Denied Oct. 21, 2002.

Brian H. Baxter, Pittsburgh, for appellant.

Gerard J. Cipriani, Pittsburgh, for appellee.

Richard H. Galloway, Greensburg, for appellees, The Kosmack Estates and Carter Estate.

Before SMITH–RIBNER, J., LEADBETTER, J., and MIRARCHI, Jr., Senior Judge.

OPINION BY Judge LEADBETTER.

The Pennsylvania Department of Transportation (PennDOT) appeals from the entry of judgment in favor of the Estates of Joseph Kosmack, Jane Kosmack, Phyllis Ward, and Mary Carter (the Kosmack family) by the Court of Common Pleas of Cambria County.

Although the record in this case is voluminous and encompasses three cases involving dozens of parties, the facts pertinent to our disposition may be summarized as follows. This case arises from an accident that occurred in the westbound lanes of State Route 22 (highway), a four-lane limited access highway which runs through Cambria County, during a snowstorm on February 24, 1994. Twenty-six vehicles had either collided or stopped on or adjacent to the paved portion of the highway near the highway's Summit exit when a tractor-trailer owned by National Freight, Inc. (National) and operated by James C. Jones (Jones) proceeded into the melee and collided with a van occupied by the Kosmack family, who were killed. At the time of the accident, a whiteout[1] caused by a snowstorm substantially reduced visibility in the area.

The initial claim in this case was filed by the Estates of the Kosmack family (referred to hereinafter as the Kosmack Estates or plaintiffs) against National and Jones. National and Jones, in turn, joined the other twenty-six drivers involved in the accident and PennDOT. Prior to trial, a settlement was reached between the Kosmack Estates and all of the parties except PennDOT. The settlement was a "Mary Carter" agreement, which provided that National would pay $3,000,000.00 to the Kosmack Estates and would receive, in exchange, 80% of any recovery obtained by the plaintiffs against non-settling defendants after the first $100,000.00 of the recovery, which the plaintiffs would retain.[2] The claim against PennDOT proceeded to trial.

At trial, the Kosmack Estates and National presented the testimony of an expert in highway design. The expert opined that the whiteout conditions were exacerbated by the "damming" of wind blowing against the incline formed by the high fill used to raise the highway, which caused

---

1. The term "whiteout" is used by the parties in this case to describe a condition in which blowing snow creates a near total loss of visibility.

2. By the time of trial, plaintiffs had settled with the remaining defendants, other than PennDOT, so that the $100,000.00 exclusion had already been satisfied. The term "Mary Carter agreement" refers not to the Mary Ward Carter whose estate is one of the plaintiffs in this matter, but to the case in which appeals of this type were first reviewed by an appellate court. See Hatfield v. Cont'l Imports, Inc., 530 Pa. 551, 554, n. 1, 610 A.2d 446, 447 (1992) [citing Booth v. Mary Carter Paint Co., 202 So.2d 8 (Fla.Dist.Ct.App.1967), overruled on other grounds in Ward v. Ochoa, 284 So.2d 385, 387 (Fla.1973)].

snow to blow over the road. The expert further opined that the problem of blowing snow could have been reduced by the construction of a snow fence along the highway. He concluded, therefore, that the highway design and the lack of a snow fence were substantial causative factors in bringing about the accidents.

After the trial, PennDOT presented a motion for a directed verdict, which was denied. The jury then returned a verdict in the amount of $2,285,000.00, finding that National and Jones were 75% negligent and that PennDOT was 25% negligent. PennDOT filed timely post-trial motions, which were denied. The Kosmack Estates filed a motion for an award of delay damages, which was granted. On November 8, 2000, judgment was entered in favor of the Kosmack Estates.

On appeal, PennDOT raises several issues, only two of which we need address. Specifically, PennDOT challenges the adequacy of the testimony of plaintiffs' expert, Ronald Eck[3] and further argues that sovereign immunity bars plaintiffs' claims.[4]

■ In making its first argument, PennDOT relies in significant part upon *Starr v. Veneziano*, 560 Pa. 650, 747 A.2d 867 (2000). In *Starr*, our Supreme Court held that to establish a duty of care on the part of a municipality to install a traffic control device, a plaintiff must establish that: 1) the municipality had actual or constructive notice of the dangerous condition that caused the plaintiff's injuries; 2) the perti-

nent device would have constituted an appropriate remedial measure; and 3) the municipality's authority was such that it can fairly be charged with the failure to install the device. *Id.* at 659, 747 A.2d at 873.

The court explained that to satisfy the second requirement, appropriateness, a plaintiff must establish that the relevant traffic control would have constituted a proper and effective measure to mitigate the hazard at the intersection. *Id.* at 660, 747 A.2d at 873. Such a requirement "arises naturally from the nature of the duty alleged, as it would be both illogical and contrary to public policy to deem a governmental entity obligated to install or erect a device which would be inappropriate to the location at issue." *Id.*

In *Starr*, the plaintiff's expert opined that a no-left-turn sign constituted a potential remedy for the dangerous traffic condition at issue. The court found the expert's testimony deficient because his proposed solution was unsupported by any traffic or engineering investigation of the intersection in question and the system of intersections along the route. *Id.* The court stated that other aspects of the expert's testimony rendering it insufficient were the expert's failure to offer even a conclusory opinion on the issue of whether a left turn was appropriate to the intersection or to establish that a signal would have been feasible or beneficial to the larger system of traffic control in the area. *Id.* at 661, 747 A.2d at 873–74.

---

**3.** PennDOT makes much of the fact that "Dr. Eck admitted that he has prepared approximately 500 expert reports directed against PennDOT in the last ten years," brief at 14. Whether this affected Dr. Eck's credibility was for the jury to determine, and is of no further concern to this court.

**4.** The other issues raised by PennDOT are whether the trial court erred in failing to transfer venue; whether the specific terms of

the Mary Carter agreement, discussed above, should have been admitted into evidence at trial; whether appellees' expert was qualified to testify about meteorology and snow control issues; whether appellees' expert's testimony exceeded the fair scope of his expert report; whether the trial court erred in submitting issues of highway design to the jury; and whether there was a basis for delay damages.

Although *Starr* was written in the context of a municipality's duty to take remedial measures where a dangerous condition becomes known, we believe its analysis applies with equal force to the duty of a government agency to adopt particular design standards in the first instance. Indeed, the need for such an appropriateness requirement is particularly compelling where the duty of care alleged involves second-guessing the design of so monumental an undertaking as a highway traversing the mountainous western region of Pennsylvania. After careful review of appellees' expert's testimony, we find it insufficient to establish that PennDOT had a duty to design the highway differently or install a snow fence.

Despite testifying that the location and design of the road were improper, the expert's report and testimony lack any concrete suggestion as to how and where the road could have been built to prevent snow from blowing over it, let alone any engineering investigation of how such a solution would have been effective and feasible. Merely to suggest, as appellees' expert does, that lowering the grade of the road would have diminished the tendency of snow to blow across the highway is insufficient, inasmuch as appellees' expert must establish that a proposed solution is both feasible and beneficial to the overall safety of the highway. The lack of such testimony is particularly troubling given the complexity and number of engineering and regulatory issues which must be considered in designing a highway such as the one at issue in this case. Since the design of Route 22 was the product of a process which required PennDOT to address a multitude of concerns other than preventing blowing snow, a plaintiff bears the burden of establishing that there is an alternative design which would have addressed all concerns.

Even more fundamentally, unlike the expert in *Starr*, who testified that a no left turn sign would have prevented the accident, Dr. Eck said only that lowering the grade of the road would "diminish or reduce the tendency of snow to be blown across this highway." (N.T. 12/9/99 at 150). There is nothing but speculation by which a jury could determine to what degree a differently designed highway might have reduced the blizzard like conditions during this snowstorm, let alone that such a design would have prevented the collisions.

Furthermore, beyond conclusory statements that a snow fence would have mitigated the effects of blowing snow, the expert's report and testimony are lacking in specificity with regard to the appropriateness of a snow fence at remedying the *specific* dangerous condition at the *particular* location at issue. The expert admitted that he had no data showing that a snow fence would have been effective in preventing snow from blowing onto a road from an embankment such as the one at issue in this case. Although admitting under cross-examination that the extent to which a snow fence would alleviate blowing snow "would depend on the height of the fence, the location to the distance from the road, [and] the direction of the fence," the expert's testimony on both direct and cross-examination lacks such salient details as the height, location, and material composition of a fence that would have effectively mitigated visibility problems from blowing snow at the scene of the accident.

Finally, as with the road design, Dr. Eck's testimony does not suggest to what degree a snow fence might have improved the conditions which led to the accidents. Significantly, after Dr. Eck stated that he had reviewed the report of PennDOT's expert on snow fence technology, Ronald Tabler, the following colloquy ensued:

Q. And you're aware then of his conclusion that a snow fence would not have worked given the conditions that existed at the time of this accident; is that correct?

A. That's correct.

Q. And you, sir, would not be qualified to disagree or challenge what he says, is that right? On that specific conclusion, are you qualified to say that he's wrong.

A. I don't know at this point that I have the data. I(sic) not sure it's a matter of qualifications; it's a matter of having the available information in terms of meteorological information on wind conditions and those sorts of things.

Q. So you didn't think it was important to get meteorological data for appearing in Court?

A. No. Because as I said, I was not asked to present or prepare a design of a snow fence system.

(N.T. 12/10/99 at 8–9).

The clear mandate of *Starr* is that a plaintiff must show that a proposed solution would effectively remedy a specific dangerous condition at a particular location. Plaintiffs simply did not meet their burden in this case.

■ Even if the expert's testimony were sufficient, we agree that appellees' claims are barred by sovereign immunity. Under the Sovereign Immunity Act, Commonwealth agencies are generally immune from tort liability. 1 Pa.C.S. § 2310; 42 Pa.C.S. § 8521(a). However, in certain enumerated circumstances, the Act waives sovereign immunity as a bar to actions against the Commonwealth "for damages arising out of a negligent act where the damages would be recoverable under the common law or a statute creating a cause of action if the injury were caused by a person not having available the defense of sovereign immunity." 42 Pa.C.S. § 8522(a). Subsection 8522(b) sets forth the specific instances in which sovereign immunity may not be raised as a defense. Relevant to the case before us is the real estate exception, which provides as follows:

§ 8522. Exceptions to sovereign immunity

(b) Acts which may impose liability.—The following acts by a Commonwealth party may result in the imposition of liability on the Commonwealth and the defense of sovereign immunity shall not be raised to claims for damages caused by:

* * *

(4) Commonwealth real estate, highways and sidewalks.—A dangerous condition of Commonwealth agency real estate and sidewalks, including Commonwealth-owned real property, leaseholds in the possession of a Commonwealth agency and Commonwealth-owned real property leased by a Commonwealth agency to private persons, and highways under the jurisdiction of a Commonwealth agency, except conditions described in paragraph (5).

42 Pa.C.S. § 8522(b)(4).

In the recent case of *Jones v. Southeastern Pennsylvania Transportation Authority,* 565 Pa. 211, 772 A.2d 435 (2001), our Supreme Court clarified the standard applicable to the real estate exception. The court, in abrogating the of/on distinction frequently used, held that to fall within the real estate exception, "a claim ... must allege that the dangerous condition 'derive[d], originate[d], or ha[d] as its source the Commonwealth realty' itself." *Id.* at 225, 772 A.2d at 443 [quoting *Snyder v. Harmon,* 522 Pa. 424, 433 n. 5, 562 A.2d 307, 311 (1989) ]. The court further explained that, assuming all other statutory requirements are met, the Commonwealth

may not raise sovereign immunity as a defense "when a plaintiff alleges, for example, that a substance or an object on Commonwealth realty was the result of a defect in the property or in its construction, maintenance, repair, or design." Id.

The collisions at issue occurred during a severe snowstorm in the mountains, which dramatically reduced the ability of drivers to see the road and control their vehicles. It is undisputable that blowing snow was the direct and proximate cause of the plaintiffs' injuries. Plaintiffs' allegation that PennDOT could have designed the road in such a way as to mitigate the effects of winter storms does not alter the fact that neither snow nor wind can be considered to have "derived, originated, or had as its source" the highway itself. Accordingly, the real estate exception to sovereign immunity does not apply and we reverse the judgment entered by the court of common pleas.

Judge SMITH–RIBNER concurs in the result only.

### ORDER

AND NOW, this 26th day of August, 2002, the judgment of the Court of Common Pleas of Cambria County entered in favor of plaintiffs and against the Pennsylvania Department of Transportation in the above captioned matter is hereby REVERSED.