[J-91-2014] [MO: Todd, J.]

# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

| | |
|---|---|
| MARGO POLETT AND DANIEL POLETT, | : No. 18 EAP 2014 |
| | : |
| Appellants | : Appeal from the Judgment of Superior |
| | : Court entered on 12/20/2013 at No. 1865 |
| | : EDA 2011 vacating and remanding the |
| v. | : Judgment entered 06/10/2011 in the Court |
| | : of Common Pleas, Civil Division, |
| | : Philadelphia County at No. 02637, August |
| PUBLIC COMMUNICATIONS, INC., | : Term 2008. |
| ZIMMER, INC., ZIMMER USA, INC., AND | : |
| ZIMMER HOLDINGS, INC, | : ARGUED:  October 8, 2014 |
| | : |
| Appellees | : |

## DISSENTING OPINION

**MR. JUSTICE EAKIN**                    **DECIDED:  October 27, 2015**

I cannot agree with the majority's conclusion the tolling agreement was not relevant, probative impeachment evidence.  Furthermore, I disagree with the majority's holdings that the trial court's supplemental instruction regarding alternate causes was permissible, and that the trial court appropriately allowed Dr. Booth to testify as an expert.  Therefore, I respectfully dissent.

Regarding the tolling agreement, "[t]he credibility of a witness may be impeached by any evidence relevant to that issue[.]"  Pa.R.E. 607(b).  Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence[.]"  Id., 401(a).  Relevant impeachment evidence may be excluded "if its probative value is outweighed by a danger of … unfair prejudice[.]"  Id., 403.  Rule 607(b) does not make relevance or admissibility dependent on the availability of other evidence.  Indeed, Rule 401 clearly states evidence is relevant if "it has any tendency to

make a fact more or less probable than it would be without the evidence[.]" Id., 401. The tolling agreement protecting Dr. Booth might cause his testimony to reflect some measure of bias, and that fact is of consequence in determining the action. The importance of Dr. Booth's potential bias to the fact finder is self-evident. See id., 401(a), (b).

While authorities cited by the majority speak to other available evidence which establishes the same fact, the evidence in question is itself the fact — the existence of an agreement between plaintiff and a witness. In the criminal sphere, agreements between the prosecution and a witness are considered important enough to make the failure to disclose them sanctionable misconduct. We are not in the criminal arena, but the logic, effect, and importance of an agreement on credibility is unchanged. Respectfully, telling the jury the doctor opined before he was insulated from suit is not the same as telling the jury that after that opinion, he actually struck a deal insulating him from suit. See Majority Slip Op., at 39-40 n.16.

This is not simply evidence that otherwise reflects on notions of credibility. We are talking about a discrete, unique piece of evidence that may significantly affect the credibility of a significant witness. The tolling agreement is not, as alleged, a complicated concept — it can be stated clearly in one sentence, and any explanations deemed necessary can be addressed by counsel with ease. And this is not precluded by the general ability to argue against credibility with some other, less-telling evidence. (Such a notion would hold inadmissible the proverbial smoking gun because other circumstances suggested guilt).

Here, the key issue in the case — a $19,602,141.23 verdict for the injured knee, plus $700,000 for a loss-of-consortium claim — was causation. After receiving the tolling agreement June 4, 2008, Dr. Booth wrote in his treatment note, "[I]n my opinion[,]

it is the filming company who asked to 'interview' Mrs. Polett with whom the responsibility lies, as well as those who employed them. I do not feel that the hospital or myself has any obligation." Dr. Booth's Treatment Note, 6/4/08 (Exhibit 6 attached to Defendants' Motion in Limine, 10/28/10). The tolling agreement triggered this self-serving suggestion of responsibility, and was therefore relevant when evaluating Dr. Booth's determination as to causation, which is the very foundation of his notion of responsibility. The agreement informed him the Poletts were considering suing him, and as the size of the verdict indicates, that was no small matter. Only after receiving the agreement did he opine that responsibility for Mrs. Polett's injuries rested solely on others, including appellees. This tends to show that Dr. Booth's opinion regarding causation was potentially biased, making it relevant. The degree of bias may or may not have been great, but I do not see how notice to a witness that he is the target of a potential lawsuit of this magnitude can be called irrelevant to evaluation of that witness's subsequent opinion testimony.

The majority opines the agreement was relevant only as a source of potential bias or interest in relation to Dr. Booth's June 4, 2008 treatment note, see Majority Slip Op., at 37-38, because Dr. Booth testified, "I was shocked by [being asked to sign the tolling agreement], and … I wanted to keep taking care of her. And now we have all got this sword hanging over us that … continues today[,]" Dr. Booth Deposition, 6/26/09, at 102. Dr. Booth further stated, "I'm approached about this tolling agreement, which was my first inkling that there was some legal implication to our relationship. …. This was very polarizing to me. No physician likes the implication[ ] that there is going to be a [law]suit." Id., at 184.

Despite Dr. Booth's testimony revealing his fear of a lawsuit, the majority concludes the agreement's probative value was "slight" and outweighed by the potential

for causing jury confusion and delay. See Majority Slip Op., at 40. Specifically, the majority states the jury would not have understood the tolling agreement and concludes the trial court would have had to hold separate proceedings, where witnesses on legal matters would have been required to testify and be cross-examined regarding the nature of tolling agreements. See id., at 41. I find this speculation unwarranted.

Such proceedings would have been unnecessary. The concept of a tolling agreement is not complicated — one party agrees not to sue another just yet. More importantly, the legal import of the agreement is peripheral — the significant thing was Dr. Booth's perception of the agreement, not the legal nuances of it. Dr. Booth articulately perceived the agreement to be a "sword" hanging over him. Dr. Booth Deposition, 6/26/09, at 102. Whether it was or was not is immaterial; it is his belief that matters. Could his belief the Poletts put a "sword" over his head color his testimony and raise credibility questions? Should not the jury answer that question?

The majority further opines the tolling agreement's probative value was "scant" because appellees could have cross-examined Dr. Booth regarding whether his fear of being sued influenced his opinion as to causation. See Majority Slip Op., at 39. This is a red herring. The test for admissibility of evidence is not whether there was other evidence; the admissibility of impeachment evidence is not negated because there may be other means to impeach a witness. See Pa.R.E. 402, 403. Having some available impeachment evidence does not make other impeachment evidence inadmissible.

I also note the Poletts, without providing any authority, assert tolling agreements are like settlement agreements and should therefore always be inadmissible. See Appellants' Brief, at 27-28. Respectfully, they are not the same. Clearly, Dr. Booth did not see the agreement as "settling" things — he saw it as starting things. While tolling

agreements should not be discouraged, as they may lead to resolutions, they may still be admissible under the Rules of Evidence when they do not.

The Poletts also argue appellees should have "cleared" Mrs. Polett before allowing her to ride the bicycle, see id., at 9, 11; however, they fail to acknowledge Dr. Booth examined her on video before she got on the bicycle. As the jury was entitled to hear evidence regarding the collaboration between the Poletts and Dr. Booth, appellees should have been permitted to impeach Dr. Booth based on all the evidence they had — including the tolling agreement. See, e.g., Hatfield v. Cont'l Imp., Inc., 610 A.2d 446, 452 (Pa. 1992) ("[W]here an agreement clearly allies two or more parties against another, such that a clear potential for bias exists which would not otherwise be apparent to the factfinder, that part of the agreement, or at least the existence of the reason for the potential bias, must be conveyed to the factfinder.").

"Error in a charge is sufficient ground for a new trial, if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue." Stewart v. Motts, 654 A.2d 535, 540 (Pa. 1995) (citation omitted). In its supplemental jury instruction, the trial court stated, "[T]o find that something other than the exercise bike caused Mrs. Polett's injuries, you must be provided with medical testimony that something else other than the bike caused those injuries[,]" and instructed the jury it "may not speculate on what else could have caused Mrs. Polett to be injured." N.T. Trial, 11/18/10 (P.M.), at 105. The word "else" is the bugaboo, as it tells the jury the injury was caused by the bike, and that such is no longer speculation.

The trial court gave the instruction after rejecting appellees' theories that Mrs. Polett's injury was caused by other factors, then held those theories had no foundation in evidence. Specifically, appellees posited Mrs. Polett's injury occurred because she had rheumatoid arthritis, was unable to take certain anti-inflammatory drugs, maintained

an active post-operative lifestyle that included traveling and performing leg presses, fell several times and fractured her patella, and did not wear her leg brace properly. Appellees offered factual evidence through their expert witness, Dr. Charles Clark. See Trial Court Opinion, 6/10/11, at 19, 45. However, the trial court prohibited appellees from presenting additional facts by sustaining the Poletts' objection to defense counsel's argument Mrs. Polett attended only eight out of 42 prescribed physical-therapy sessions, that she threw out Dr. Booth's documents detailing the activities in which she could engage, and that she did not clear her activities with Dr. Booth. See Majority Slip Op., at 13.

In its instruction, the trial court required the jury to consider appellees' theories regarding causation only if they were based upon medical testimony — however, the Poletts' own contention that the bicycle caused Mrs. Polett's injury was not founded upon medical testimony. Dr. Booth's testimony about the bicycle was not grounded on the medical; he failed to provide medical testimony establishing why the bicycle caused Mrs. Polett's injury. Moreover, as the Superior Court correctly concluded, appellees' other causation theories were "designed to show that Mrs. Polett could not demonstrate the causal connection required to show that her injuries were related to riding the exercise bike[,]" and appellees "properly challenged the sufficiency of [appellants'] evidence by demonstrating the lack of a causal connection between the exercise [bike] and her injuries." Polett v. Pub. Communications, Inc., 83 A.3d 205, 218 (Pa. Super. 2013). Appellees' evidence therefore "had the cumulative effect of demonstrating [Mrs. Polett's] comparative negligence and undermining her credibility as to the cause of her injuries[,]" id., and should not have been eviscerated by the trial court's inappropriate, one-sided supplemental instruction.

Finally, regarding Dr. Booth being permitted to testify as an expert, I note Rule 4003.5 provides experts holding opinions "acquired or developed in anticipation of litigation" must be identified prior to trial. Pa.R.C.P. 4003.5(a); see also id., 4003.5(b) ("An expert witness whose identity is not disclosed in compliance with subdivision (a)(1) of this rule shall not be permitted to testify on behalf of the defaulting party at the trial of the action."). Rule 4003.5 is inapplicable only when opinions are not formed in anticipation of litigation. See Miller v. Brass Rail Tavern, 664 A.2d 525, 530-32 (Pa. 1995) (holding coroner could testify regarding time of death because opinion was not developed in anticipation of litigation). The purpose of Rule 4003.5 is to provide notice to parties to "prevent[] surprise testimony at trial concerning grounds never raised during the discovery." Pa.R.C.P. 4003.5 cmt.

In allowing Dr. Booth to testify as an expert, the trial court relied upon his September 20, 2006 and October 23, 2006 treatment notes and emphasized he was not going to offer an opinion on the issue of negligence at trial. However, Dr. Booth did not offer causation opinions in his 2006 treatment notes. Rather, he first stated his opinion as to liability in his June 4, 2008 note, after receiving the tolling agreement, by writing, "[I]t is the filming company … with whom the responsibility lies[.]" Dr. Booth's Treatment Note, 6/4/08 (Exhibit 6 attached to Defendants' Motion in Limine, 10/28/10). At this point, Dr. Booth clearly anticipated the "sword" of litigation hanging over him. Dr. Booth Deposition, 6/26/09, at 102.

Moreover, although Dr. Booth offered an opinion as to liability in his June, 2008 note, he did not provide causation opinions until he was deposed. Dr. Booth admitted he did not view the video of Mrs. Polett exercising on the bicycle until the litigation began, and he did not investigate the cause of her injuries because his only concern was treating her. See id., at 33-34, 42, 140-42, 158, 177. The majority ignores these

admissions and refuses to disturb the trial court's determination the treatment notes "'speak for themselves.'" Majority Slip Op., at 48-49 (quoting Trial Court Opinion, 6/10/11, at 25). All documents speak for themselves — the question is what they say. Here, as discussed above, those notes provided no medical evidence establishing how the bicycle caused Mrs. Polett's injury and failed to address evidence regarding her misuse of her leg. Dr. Booth's treatment notes were therefore not proper causation opinions developed while treating Mrs. Polett; instead, these notes established, at most, not medical connections, but "a temporal connection between Mrs. Polett riding the exercise bike and her injuries[.]" Polett, at 220.

Because Dr. Booth first offered causation opinions at his deposition in 2009, his comments were in contemplation of litigation under Rule 4003.5. The Poletts improperly shielded Dr. Booth from Rule 4003.5's requirements by characterizing him as a treating physician, and appellees were prejudiced by this discovery violation. Appellees were unable to appropriately prepare their questioning of Dr. Booth because he was not disclosed as an expert, did not prepare an expert report, and did not answer interrogatories.

In sum, the tolling agreement under these facts was highly relevant and should have been made known to the jury. The trial court excluded evidence that was at least facially relevant to alternative causes; the trial court then relied on the absence of such evidence when instructing the jury. The supplemental jury instruction told the jury the Poletts' theory of causation (accepted as true by the instruction itself) could only be overcome by medical testimony, while the Poletts' theory itself had no causation evidence that could be called "medical," save that it came from a doctor who was not eligible to testify as an expert.

I would affirm the Superior Court's decision, and therefore dissent.

Mr. Chief Justice Saylor joins this dissenting opinion.